**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

HARRIET P. JINWRIGHT,
          *Defendant-Appellant.*

No. 10-5289

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

ANTHONY L. JINWRIGHT,
          *Defendant-Appellant.*

No. 10-5290

Appeals from the United States District Court
for the Western District of North Carolina, at Charlotte.
Frank D. Whitney, District Judge.
(3:09-cr-00067-FDW-2; 3:09-cr-00067-FDW-1)

Argued: May 18, 2012

Decided: June 22, 2012

Before WILKINSON, NIEMEYER, and
KING, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Niemeyer and Judge King joined.

**COUNSEL**

**ARGUED:** Ann Loraine Hester, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina; Joshua Daniel Davey, MCGUIREWOODS, LLP, Charlotte, North Carolina, for Appellants. David Alan Brown, Sr., OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Henderson Hill, Executive Director, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant Harriet P. Jinwright; Jennifer L. King, MCGUIREWOODS, LLP, Charlotte, North Carolina, for Appellant Anthony L. Jinwright. Anne M. Tompkins, United States Attorney, Craig D. Randall, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

Anthony and Harriet Jinwright, former co-pastors of Greater Salem Church in North Carolina, appeal their convictions and sentences arising from a tax evasion scheme in which they omitted millions of dollars of taxable income from their jointly filed tax returns. The Jinwrights raise a variety of challenges on appeal. Finding each contention to be without merit, we affirm the judgment of the district court.

I.

Mr. and Mrs. Jinwright were convicted of conspiracy to defraud the United States in violation of 18 U.S.C. § 371 and of three counts of tax evasion for the years 2005-2007, and aiding and abetting the same, in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2. Mr. Jinwright was convicted (and Mrs. Jin-

wright acquitted) of three additional counts of tax evasion for the years 2002-2004, as well as six counts of filing a false tax return in violation of 26 U.S.C. § 7206(1). The Jinwrights were also acquitted of several other charges not at issue in this appeal. The Jinwrights' convictions followed a four-week trial that involved the admission of over 90,000 pages of documentary evidence and the testimony of more than 70 witnesses. The facts most relevant to this appeal are summarized here.

## A.

Prior to this litigation, Mr. Jinwright had served as senior pastor of Greater Salem Church (GSC) since 1981. Mrs. Jinwright played an active role in church life during her husband's ministry and began to draw a salary from GSC as a pastor of the church in about 2000. Over the course of their time with GSC, the Jinwrights were co-chairs of the GSC board of directors and served on a number of committees within the church, including those responsible for financial decisions. Mr. Jinwright had final authority over employee salaries and church finances more generally.

When Mr. Jinwright first became pastor at GSC, his salary was about $10,000. By 2001, his salary had increased to approximately $148,000. It reached about $300,000 by 2007. Between 2001 and 2007, GSC provided Mr. Jinwright with substantial benefits, in addition to his salary, that he underreported on his tax returns. He received housing allowances of between $130,000 and $160,000 per year, travel allowances of $19,000 to $48,000 per year, payments for his children's tuition and his federal income tax liability, and unlimited use of a luxury car leased by the church in addition to an annual vehicle allowance. Mr. Jinwright also received annual bonuses of $35,000 to $50,000, as well as separate Christmas bonuses. He had use of a GSC credit card and received reimbursements for purported business-related expenses that remained unsubstantiated. Taken together, Mr. Jinwright's total GSC compensation between 2001 and 2007 totaled

nearly $3.9 million. During that time, Mrs. Jinwright received similar compensation from GSC in the form of salary, bonuses, allowances, and reimbursements, totaling nearly $1 million.

The Jinwrights earned more income outside of GSC. Together they earned tens of thousands of dollars in additional income for speaking at other churches that they failed to report to the IRS. Mr. Jinwright established an organization known as A.L. Jinwright Ministries, Inc. (ALJM), purportedly to receive his income from outside speaking engagements. Mrs. Jinwright was responsible for handling ALJM's bank statements and providing the corporation's financial information to the Jinwrights' CPA. Although defendants kept the income earned through this business, GSC paid its operating expenses. Mr. Jinwright also founded the Pastors Consortium. The consortium, with a membership of other pastors, held annual events celebrating the anniversaries of the members' churches. During these celebrations the participants would exchange "gifts" to one another in the form of checks for thousands of dollars.

IRS Revenue Agent Linda Polk reconstructed defendants' taxable income for the years 2002-2007 and testified at trial as to her conclusions regarding defendants' income and tax liabilities for those years. She treated as taxable income all GSC compensation by check, all payments for business-related expenses for which there was no substantiation, and payments received by defendants for speaking at other churches. Polk testified that defendants understated their taxable income by $2,486,771 between 2002 and 2007, resulting in a tax deficiency of $664,352 for those years.

B.

In light of the substantial evidence that the Jinwrights underreported their income from 2002 through 2007, the central dispute at trial concerned the defendants' knowledge of

wrongdoing. *See Sansone v. United States*, 380 U.S. 343, 351 (1965) (elements of tax evasion under 26 U.S.C. § 7201 are "willfulness; the existence of a tax deficiency, and an affirmative act constituting an evasion or attempted evasion of the tax") (internal citations omitted). Mr. Jinwright testified that he and Mrs. Jinwright did not intend to evade their tax obligations. To establish that defendants knowingly understated their taxable income, the government introduced evidence of unreported income in the form of allowances, unsubstantiated reimbursements, bonuses and "gifts." The government also tendered evidence of defendants' extravagant spending that exceeded the income they reported, including over a million dollars spent between 2001-2007 on mortgage and lease payments for two homes and several luxury cars.

Between 2001 and 2007, defendants reported total income of slightly more than $1.8 million, but claimed personal deductions of nearly $1.6 million, which would have left them with only about $28,000 to spend per year on nondeductible expenses. Yet the Jinwrights spent substantially more than that. Analysis of defendants' bank accounts revealed that from 2001-2007 the Jinwrights deposited and spent $3 million in excess of their reported income for those years. They also reported income on multiple loan applications between 2000 and 2006 that exceeded the reported income on their corresponding tax returns. They claimed tens of thousands of dollars in deductions for ALJM, even though the corporation had no employees and GSC bore its primary operating costs.

The government also presented evidence that the Jinwrights were informed multiple times of their legal duties and continued to breach them. Between 2001 and 2004, GSC undertook several audits to assist the church in obtaining tax-exempt status under I.R.C. § 501(c)(3). The auditors identified several problems with GSC's finances and informed the Jinwrights that they should be reporting their entire compensation package, including reimbursements for unsubstantiated expenses, as well as payments from GSC and other churches designated

as "love gifts." Nonetheless in 2001, for example, the Jinwrights' tax return reported almost $150,000 less than the auditors determined to be Mr. Jinwright's total compensation from GSC for that year. Several GSC employees, including three individuals who worked in the position of finance administrator, similarly told the Jinwrights that the variety of payments they were receiving from GSC constituted taxable income.

Yet the Jinwrights failed to inform their personal CPA Terry Lancaster about GSC compensation other than salary and housing allowances, which Lancaster testified he would have included as income in their returns had he known about it. According to the government, the defendants also structured their GSC compensation to conceal it from the IRS. For example, they directed that their non-salary compensation be paid out of the GSC operating account, rather than the payroll account. As a result, those payments were not included on the Jinwrights' W-2 forms and, per Mr. Jinwright's instruction, no 1099 forms were issued to disclose the added income to the IRS. Jacqueline Joyner-Jones, who served as an administrative assistant to the Jinwrights from 2001-2007, testified that the defendants instructed her to forge numerous checks from GSC Women of Faith Ministry, a subsidiary of GSC ministry. The checks were designated as reimbursements and included a $15,000 check in 2006 to cover Mr. Jinwright's tax liability.

The government presented evidence that defendants instructed GSC employees to alter GSC financial records to mislead both the congregation and the IRS. By 2002, the church began experiencing financial difficulties. According to several former GSC finance administrators, the Jinwrights paired extra months of revenues with fewer months of expenses in GSC's financial reports to conceal the church's level of debt. The financial reports also buried the amount of the Jinwrights' compensation by including all GSC employee salaries in one line item. Several of these misleading reports

were submitted to the IRS with GSC's applications for section 501(c)(3) tax-exempt status.

Although GSC's section 501(c)(3) application in 2002 understated Mr. Jinwright's total compensation, the IRS nonetheless denied the application on the basis that his compensation was too high. CPA Robert Howze assisted with a second application in 2003, and reported Mr. Jinwright's compensation at more than $600,000 even though Mr. Jinwright had reported only about $280,000 on his tax return. As a result, the IRS began an investigation into the Jinwrights' tax filings and uncovered evidence that between 2002 and 2007 the Jinwrights had understated their taxable income by over $2 million. The government eventually obtained a nineteen-count superseding indictment against the Jinwrights. Their trial resulted in conviction on charges of conspiracy to defraud the United States, tax evasion and aiding and abetting the same, and for Mr. Jinwright, filing false tax returns.

C.

At sentencing, the district court determined that the Jinwrights had willfully omitted more than $3 million in taxable income from their joint returns, causing a tax loss to the United States and the State of North Carolina of approximately $1.3 million. The court relied on testimony from IRS Agent Polk, who accounted for tax losses from 2002 through 2007, as well as tax losses for the years 1991-1993, 1998-2001, and 2008. In calculating their base offense levels and the amount of restitution each defendant owed, the court held Mrs. Jinwright responsible for losses from 1998-2008, and Mr. Jinwright responsible for losses from 1991-1993 and 1998-2008.

The court applied sentencing enhancements for role in the offense (two levels), the use of sophisticated means (two levels), and abuse of a position of trust (two levels). Mr. Jinwright also received a two-level enhancement for obstruction.

Each defendant was sentenced within the calculated Guidelines range: Mr. Jinwright to 105 months' imprisonment and restitution in the amount of $1,278,556, and Mrs. Jinwright to 80 months' imprisonment and restitution in the amount of $1,174,921. The Jinwrights appeal their convictions and sentences. They raise a number of challenges and we shall address each in turn.

## II.

The Jinwrights contend that the district court issued two jury instructions that impermissibly relieved the government of its burden of proof. We turn first to the trial court's instruction on willful blindness, against which appellants advance two arguments. First, that the trial evidence did not support the issuance of a willful blindness instruction. Second, that the instruction misstated the legal standard of willful blindness. We review for abuse of discretion both the district court's decision to offer an instruction and the content of that instruction. *See United States v. Lighty*, 616 F.3d 321, 366, 377 (4th Cir. 2010).

The Jinwrights are correct that requests for willful blindness instructions should be handled with caution. *Id.* at 378. But they come close to seeking the categorical exclusion of such instructions while pointing to no court that has adopted so absolute a rule. There are cases where the evidence demonstrates that a defendant undertook an active and deliberate effort to avoid imbuing himself with the knowledge that would support a criminal conviction. To allow the most clever, inventive, and sophisticated wrongdoers to hide behind a constant and conscious purpose of avoiding knowledge of criminal misconduct would be an injustice in its own right. As much of one, in fact, as a conviction under a plainly impermissible recklessness or negligence standard. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2069 (2011) ("The traditional rationale for this doctrine is that defendants who behave in this manner are just as culpable as

those who have actual knowledge."). For the reasons that follow, we think the district court properly set a high bar in its instruction for the government to prove willful blindness, while simultaneously recognizing the powerful evidence of such blindness in this case.

## A.

The Jinwrights first contend that the evidence did not support a willful blindness instruction. The trial court issued such an instruction at the government's request and over the Jinwrights' objection. The crimes for which the Jinwrights were convicted—both Jinwrights for conspiracy to defraud the United States and tax evasion, Mr. Jinwright also for filing false tax returns—each required the government to prove that the defendants acted willfully. Willfulness with respect to tax crimes has been defined in essence as a knowledge requirement, or the "intentional violation of a known legal duty." *United States v. Pomponio*, 429 U.S. 10, 12 (1976) (per curiam). When applied, the doctrine of willful blindness permits the government to prove knowledge by establishing that the defendant "deliberately shield[ed] [himself] from clear evidence of critical facts that are strongly suggested by the circumstances." *Global-Tech*, 131 S. Ct. at 2068-69. Willful blindness may satisfy knowledge in a criminal tax prosecution, where "the evidence supports an inference that a defendant was subjectively aware of a high probability of the existence of a tax liability, and purposefully avoided learning the facts pointing to such liability." *United States v. Poole*, 640 F.3d 114, 122 (4th Cir. 2011).

These conditions were satisfied here. Mr. Jinwright denied knowledge of his legal obligations and testified that he and Mrs. Jinwright did not know that their tax returns contained a deficiency. But the government presented evidence to suggest that defendants were aware of a "high probability" that they were understating their income to the IRS. For example, defendants' tax returns for 2001 to 2007 claimed personal

deductions of nearly $1.6 million despite reporting about $1.8 million of taxable income. During those years, defendants deposited into their bank accounts and spent over $3 million more than they reported as income on their tax returns.

In addition, the government introduced evidence indicating that the defendants purposely avoided learning the fact of their liability. Between 2002 and 2007, several auditors and GSC administrators advised the defendants that they were underreporting their income, but defendants never raised these concerns with their personal CPA, who could easily have explained the law. The Jinwrights also failed to clarify their alleged confusion regarding the tax treatment of honoraria and "love offerings," instead simply excluding these payments from income. The Jinwrights' CPA testified that the Jinwrights never informed him of the substantial compensation from GSC that they specifically structured so as not to appear on their W-2s.

The government's presentation of evidence that the Jinwrights actually knew of their tax code violations did not preclude it from seeking a willful blindness instruction. *United States v. Abbas*, 74 F.3d 506, 513 (4th Cir. 1996). In light of Mr. Jinwright's denial of knowledge and the evidence supporting an inference of deliberate ignorance on the part of defendants, the court's provision of a willful blindness instruction was not an abuse of discretion.

B.

Appellants next take issue with the content of the willful blindness instruction. They contend that the court violated their Fifth Amendment due process rights by allowing the jury to convict them based on recklessness, thereby diminishing the government's burden of proving willfulness. The Fifth Amendment Due Process Clause and the Sixth Amendment jury trial right together require "criminal convictions to rest upon a jury determination that the defendant is guilty of every

element of the crime with which he is charged, beyond a reasonable doubt." *United States v. Gaudin*, 515 U.S. 506, 510 (1995). A court runs afoul of this protection when it issues an instruction that relieves the government of its burden of proof with respect to an element of a charged offense. *See Carella v. California*, 491 U.S. 263, 265 (1989) (per curiam). We conclude, however, that "the instructions, taken as a whole, adequately state the controlling law." *United States v. Wills*, 346 F.3d 476, 492 (4th Cir. 2003).

Appellants rely heavily on the Supreme Court's recent decision in *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011), which emphasized that willful blindness has a "limited scope that surpasses recklessness and negligence." The Court defined a reckless defendant as "one who merely knows of a substantial and unjustified risk of . . . wrongdoing" and a negligent defendant as "one who should have known of a similar risk but, in fact, did not." *Id.* at 2071.

Unlike the instruction at issue in *Global-Tech*, however, the one here specifically admonished the jury that it was not enough to find that defendants "were reckless or foolish in failing to recognize what was occurring" and that a "showing of negligence is not sufficient to support a finding of willfulness or knowledge." The court cautioned the jury that a "willful blindness charge does not authorize you to find that the defendants acted knowingly because they should have known what was occurring, or that in the exercise of hindsight they should have known what was occurring, or because they were negligent in failing to recognize what was occurring."

The trial court's instruction here was thus faithful to the willful blindness standard set forth in *Global-Tech*. *Global-Tech* synthesized the case law on willful blindness to identify "two basic requirements": "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech*, 131 S. Ct. at 2070. The

district court included this relevant language here, instructing the jury: "If you find that the defendants were aware of a *high probability*" that they were violating the law "and that the defendants *acted with deliberate disregard* to these facts, you may find the defendants acted knowingly" (emphasis added). The Jinwrights were convicted before the *Global-Tech* decision, but the language of the willful blindness instruction still tracks the factors enumerated there by the Supreme Court.

At the end of the day, the trial court's instruction required that defendants' ignorance be "solely and entirely the result of a conscious purpose to avoid learning the truth." Taken as a whole, the instruction plainly conveyed the government's burden to prove beyond a reasonable doubt conduct that transcended recklessness and negligence, which the evidence shows overwhelmingly the defendants' conduct did. *See United States v. Martin*, 773 F.2d 579, 584 (4th Cir. 1985).

III.

A.

The Jinwrights also object to the district court's instructions to the jury regarding the tax treatment of payments from an employer to an employee. As part of its burden of proof on the charged offenses, the government was required to prove that the Jinwrights received income that they did not properly report on their tax returns. *See, e.g.*, *Boulware v. United States*, 552 U.S. 421, 424 (2008) ("One element of tax evasion under § 7201 is 'the existence of a tax deficiency.'"). To that end, the government sought to establish that GSC made payments to the Jinwrights that they were required to include in gross income as compensation from their employer.

During the government's case-in-chief, however, three former GSC employees—business administrator Varnell Gray, administrative assistant Jacqueline Joyner-Jones, and finance administrator Travis Mauney—described payments from GSC

to the Jinwrights as "gifts." Because gifts are excludable from gross income, *see* I.R.C. § 102(a), the government objected in each instance that this testimony would mislead the jury to conclude that the compensation was nontaxable as a matter of law. The court thus instructed the jury three times during the presentation of evidence, and again during the final jury charge, as follows:

> Any amount transferred by or for an employer to or for the benefit of an employee is income. Such payments are not gifts under the Internal Revenue Code and may not be excluded from gross income regardless of how the payments by the employer to the employee are characterized.

> Additionally, payments by an employer to an employee, or on the employee's behalf as reimbursements for business-related expenditures, must be included in the gross income of the employee unless the expenses are ordinary and necessary business expenses, the business nature of the expenses has been substantiated, and any unsubstantiated payments have been returned to the employer.

The Jinwrights contend that the instruction unconstitutionally directed the jury to find an element of the offenses charged, namely that the Jinwrights received payments that they were required to report as gross income. *See Carella*, 491 U.S. at 265. For the reasons that follow, we disagree.

A district court may instruct the jury on applicable law and is permitted to "instruct the jury before or after the arguments are completed, or at both times." Fed. R. Crim. P. 30(c). Here, the court did just that. It is apparent that the relationship between an employer and employee is one that is commonly established for some kind of mutual benefit, a dynamic that is altogether different from the "detached and disinterested generosity" that normally prompts the tender of a gift.

*Comm'r v. Duberstein*, 363 U.S. 278, 285 (1960). The instruction at issue correctly explained the relevant tax law, which is clear that payments from an employer to an employee are not gifts, but are presumed to be included in gross income. A taxpayer must report as gross income "all income from whatever source derived," I.R.C. § 61, unless "excluded by law," 26 C.F.R. § 1.61-1(a); *see Comm'r v. Banks*, 543 U.S. 426, 433 (2005). To be sure, § 102(a) of the Code excludes from gross income "the value of property acquired by gift." I.R.C. § 102(a). But the Code is explicit that payments from an employer to an employee do not constitute gifts under § 102(a), which "shall not exclude from gross income any amount transferred by or for an employer to, or for the benefit of, an employee." I.R.C. § 102(c).

Absent a clarifying instruction, the jury may have mistaken the testimony from several witnesses that GSC's payments to the Jinwrights were "gifts" as a legal conclusion that these payments were nontaxable. To prevent juror confusion, the district court alerted the jury that as a matter of law, payments from an employer to an employee do not qualify as nontaxable gifts, irrespective of the employer's intent. But the jury was left to determine that the Jinwrights did in fact receive payments from their employer, GSC—an uncontroversial point which the Jinwrights essentially conceded. From this factual finding, it followed as a matter of law that GSC's payments to the Jinwrights did not constitute gifts qualifying for exclusion from gross income.

### B.

Although payment from an employer does not qualify as an excludable gift, the jury instruction elaborated that employer reimbursements may qualify for deduction from gross income if certain conditions are satisfied. *See* I.R.C. § 62(a)(2)(A); 26 C.F.R. § 1.62-2. Appellants argue that the court thus created a presumption that any employer payments were includable gross income, impermissibly shifting the burden to defendants

to prove that the unreported payments were deductible reimbursements for substantiated business expenses. But we will not fault the district court for being thorough, as well as accurate, in its explanation of the relevant law. Under the tax law, the "burden of clearly showing the right to the claimed deduction is on the taxpayer." *INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 84 (1992) (internal quotation marks omitted).

Our sister circuits have consistently applied this principle in criminal tax cases—recognizing that "the burden is on the defendant to prove that he had allowable deductions which were not shown in his return once the Government establishes unreported income." *Elwert v. United States*, 231 F.2d 928, 933 (9th Cir. 1956); *see also United States v. Tarwater*, 308 F.3d 494, 508 (6th Cir. 2002) ("[W]hile the government bears the burden of proof throughout any criminal tax case, the government is not required to negate every possible source of nontaxable income, to track down all possible expenses, or to prove the absence [of] any off-setting costs or deductions.") (collecting cases); *United States v. Nathan*, 536 F.2d 988, 991 (2d Cir. 1976) ("The applicable rule here is that uniformly applied in tax evasion cases—that evidence of unexplained receipts shifts to the taxpayer the burden of coming forward with evidence as to the amount of offsetting expenses, if any.") (quoting *Siravo v. United States*, 377 F.2d 469, 473 (1st Cir. 1967)).

This case is unlike *United States v. Mogavero*, 521 F.2d 625 (4th Cir. 1975), where the instruction in a net worth tax prosecution actually shifted to the defendant the government's ultimate burden of proof. Here, it is plain that the government retained its burden of proof on every element of the charges, including the burden to establish that the Jinwrights failed to report income to the IRS. Before the burden shifted to the defendants to demonstrate the deductibility of unreported income, the government established that the Jinwrights received several millions of dollars from their employer that they omitted from gross income. This offer of proof created

a presumption that the income was taxable as a matter of law. In turn, the defendants failed to establish that these payments satisfied the reimbursement criteria under a plan qualifying for deduction pursuant to I.R.C. § 62. *See* 26 C.F.R. § 1.62-2. Because the instruction contained no constitutional infirmity, but correctly guided the jury on the relevant law, it did not constitute an abuse of discretion.

IV.

In addition to instructing the jury on the tax treatment of employer-employee payments, the trial court limited the defense's ability to cross-examine Gray, Joyner-Jones, and Mauney about their belief that payments from GSC to the Jinwrights constituted gifts. The Jinwrights insist that the court's evidentiary limits burdened their ability to disprove the offense element of willfulness, which for purposes of criminal tax offenses requires "the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991). Appellants argue that the belief within the church community that the GSC payments were nontaxable gifts, even if mistaken on the law, was relevant to show the Jinwrights' own ignorance of their legal duties.

A defendant's Fifth Amendment right to due process guarantees "the right to a fair opportunity to defend against the State's accusations," which, under the Sixth Amendment, includes the "rights to confront and cross-examine witnesses and to call witnesses in one's own behalf." *Chambers v. Mississippi*, 410 U.S. 284, 294-95 (1973). The right to cross-examine, however, "is not absolute." *Id.* at 295. A trial court retains "discretion in limiting needless or confusing inquiry into collateral matters." *United States v. Cole*, 622 F.2d 98, 100 (4th Cir. 1980) (per curiam). Moreover, a defendant's Sixth Amendment right "'to be confronted with the witnesses *against him*'" does "not give defendants a plenary right to

elicit friendly testimony." *United States v. Crockett*, 813 F.2d 1310, 1313 (4th Cir. 1987) (quoting U.S. Const. amend. VI). Instead, "that is the purpose of the Sixth Amendment right of a defendant 'to have compulsory process for obtaining witnesses in his favor.'" *Id.* (quoting U.S. Const. amend. VI).

The decision to limit cross-examination was a reasonable precaution, in conjunction with the jury instruction on employer-employee payments, to prevent juror confusion regarding the taxability of income from GSC. The testimony that the GSC payments were "gifts"—although offered by witnesses called by the government—was favorable to the defense and contrary to the government's effort to establish that the payments were taxable gross income. The defense's desire for the witnesses to elaborate on their beliefs under cross-examination therefore fell outside "the confrontational essence of the Confrontation Clause." *Id.* at 1314. Appellants mistakenly conflate a defendant's right to "challenge adverse testimony," *id.* at 1314, with his Sixth Amendment right "to have compulsory process for obtaining witnesses in his favor," U.S. Const. amend. VI, a right with which the district court did not interfere. In fact, the court explicitly invited the Jinwrights to recall the favorable witnesses during their case-in-chief in the event the testimony proved relevant to the defense.

*Cheek v. United States*, 498 U.S. 192 (1991), is not to the contrary. *Cheek* held that a good faith misunderstanding of one's legal duties is a defense in a criminal tax prosecution "whether or not the claimed belief or misunderstanding is objectively reasonable." *Id.* at 202. The trial court in *Cheek* therefore ran afoul of the Sixth Amendment when it instructed the jury to disregard the defendant's testimony that he misunderstood his obligations under the tax law. *Id.* at 203. Here, by contrast, the district court did not impede the Jinwrights' good faith defense. In fact, the court admitted, and the jury considered, Mr. Jinwright's testimony that he and Mrs. Jinwright were ignorant that they were violating the tax law.

Moreover, *Cheek* emphasized that it "would of course be proper to exclude evidence having no relevance or probative value with respect to willfulness." *Id.* None of the witnesses at issue claimed to have discussed with the Jinwrights his or her belief that the payments from GSC were gifts and no evidence established at that point that the Jinwrights relied on a community-wide misunderstanding of the law. The district court therefore properly concluded that testimony from these witnesses on cross-examination about their own beliefs was not relevant to the Jinwrights' ignorance of the law. Nonetheless, as appellants concede, the trial court left open the possibility of recalling these witnesses during the defense's case once Mr. Jinwright testified and a foundation had been laid for a *Cheek* defense. Defendants' failure to do so rests squarely on their shoulders. We shall therefore uphold the evidentiary ruling of the district court.

## V.

## A.

Mrs. Jinwright contends that the district court erred by calculating her tax loss amount at greater than $1 million, resulting in a base offense level of 22. *See* U.S.S.G. §§ 2T1.1, 2T4.1. The loss amount is critical to sentencing in criminal tax cases simply because the greater the fraud upon the Treasury, the more substantial the punishment. For an offense involving tax evasion or a fraudulent or false return, tax loss is "the total amount of loss that was the object of the offense." U.S.S.G. § 2T1.1(c)(1). It includes losses arising from relevant criminal conduct that is "part of the same course of conduct or common scheme or plan." *United States v. Fleschner*, 98 F.3d 155, 160 (4th Cir. 1996); *see* U.S.S.G. § 2T1.1 cmt. n.2. In the case of conspiracy, relevant conduct that occurred during commission of, or in preparation for, the offense of conviction extends to "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).

The district court determined that Mrs. Jinwright was responsible for a combined tax loss of $1,174,921 for the years 1998-2008, adopting in large part the loss amounts calculated by IRS Agent Polk. Mrs. Jinwright does not challenge the accuracy of the loss computations, but argues instead that the district court erroneously included loss amounts that were not attributable to her criminal conduct. The jury acquitted Mrs. Jinwright of tax evasion for years preceding 2005 and, according to appellant, thereby discredited any evidence that she had criminal knowledge before 2005.

We are not persuaded. Although relevant conduct under the Guidelines "must be criminal conduct," *see United States v. Dove*, 247 F.3d 152, 155 (4th Cir. 2001), an acquittal "does not necessarily establish the criminal defendant's lack of criminal culpability," *United States v. Scott*, 437 U.S. 82, 106 (1978) (Brennan, J., dissenting), and a "jury cannot be said to have 'necessarily rejected' any facts when it returns a general verdict of not guilty," *United States v. Watts*, 519 U.S. 148, 155 (1997) (per curiam). Instead, the "different standards of proof that govern at trial and sentencing" enable the sentencing court to find a fact by a preponderance of the evidence that the jury may not have found beyond a reasonable doubt. *Id.* at 155.

The sentencing court was therefore entitled to "consider conduct of the defendants underlying charges of which they had been acquitted" in determining the appropriate sentence. *Id.* at 149. What is more, as part of its relevant conduct analysis the district court was required to consider evidence of losses not contained in the indictment but relevant to the offense of conviction. *United States v. Hayes*, 322 F.3d 792, 801-02 (4th Cir. 2003); *see also United States v. Jones*, 31 F.3d 1304, 1316 (4th Cir. 1994) (relevant conduct may include criminal acts that preceded the date the convicted offense was committed). Thus the district court did not err in considering Mrs. Jinwright's criminal conduct before 2005.

The court moreover provided a "sufficient explanation of its rationale" to support its tax loss finding. *United States v. Wilkinson*, 590 F.3d 259, 269 (4th Cir. 2010). The district court found a pattern of "long-term conduct" that "went on for, in [the] Court's eyes, approximately a decade." Unlike the three tax evasion counts of which Mrs. Jinwright was acquitted, both she and her husband were convicted of conspiracy. Although count one of the indictment charged the Jinwrights with conspiring to defraud the United States between 2002 and 2008, the indictment alleged overt acts in furtherance of the conspiracy committed as early as 1991 and 1998. The government presented evidence at trial to support these allegations, offering proof that the Jinwrights underreported their income and filed false joint tax returns beginning in 1991.

The district court therefore had ample basis to conclude that losses arising from acts committed before 2002 occurred "as part of the same course of conduct or common scheme or plan." *Fleschner*, 98 F.3d at 160. And it held Mrs. Jinwright, as a co-conspirator, responsible for all reasonably foreseeable acts taken by Mr. Jinwright in furtherance of the joint scheme. *See* U.S.S.G. § 1B1.3(a)(1)(B). The court found that the Jinwrights' tax deficiencies from 1991 to 1993, arising largely from unreported GSC compensation to Mr. Jinwright, were not reasonably foreseeable by Mrs. Jinwright. Thus, it declined to count those amounts in calculating Mrs. Jinwright's tax loss amount. By contrast, the court found that Mrs. Jinwright was "responsible for all the other years . . . that's '98 through 2008" because "based on the evidence at trial, she began to get much more involved in the operation of the church and of the A.L. Jinwright Ministries." Mrs. Jinwright's increasing role at GSC supports the conclusion that by 1998 she was a participant in the conspiracy who could reasonably foresee acts by Mr. Jinwright in furtherance of it. Together with the court's finding that the pattern of criminal conduct spanned about a decade, the court sufficiently explained its inclusion of tax loss amounts for Mrs. Jinwright for 1998-2008.

B.

Mr. and Mrs. Jinwright argue that the district court erred in calculating the amount of restitution they owed pursuant to the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A. Mr. Jinwright was ordered to pay restitution in the amount of $1,278,556 based on tax loss amounts for 1991-1993 and 1998-2008, and Mrs. Jinwright to pay $1,174,921 based on tax loss amounts for 1998-2008.

The Jinwrights contend that the district court erred when it ordered them to pay restitution based on losses prior to the years for which they were convicted of criminal conduct. They rely on our observation in *United States v. Llamas*, 599 F.3d 381, 391 (4th Cir. 2010), that "in the context of a conspiracy, a restitution award under the MVRA is limited to the losses attributable to the specific conspiracy offenses for which the defendant was convicted." Appellants, however, read too much into *Llamas*, which merely held that a defendant may not be ordered to pay restitution for losses caused by other similar fraudulent schemes in which he did not participate and for which he was not convicted. It did not pass on the issue before us here.

Rather, our precedent suggests that the Jinwrights were appropriately ordered to pay restitution for losses arising from conduct underlying their convictions for conspiracy. The MVRA orders that a defendant make restitution to the "victim of the offense." 18 U.S.C. § 3663A(a)(1). With respect to "an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity," a victim is defined broadly to include "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *Id.* § 3663A(a)(2). We interpreted identical language under the other federal restitution statute, the Victim and Witness Protection Act, 18 U.S.C. § 3663(a)(2), as "expanding district courts' authority to grant restitution" with respect to losses arising from conspiracy offenses. *United States v.*

*Henoud*, 81 F.3d 484, 488 (4th Cir. 1996). Specifically, a district court is authorized to include in restitution the "losses that result from a criminal scheme or conspiracy, regardless of whether the defendant is convicted for each criminal act within that scheme." *Id.* at 488. In *Henoud* we held that the district court did not therefore err by "ordering restitution for losses caused by acts for which the defendant was not convicted." *Id.* at 489. Rather, the district court properly looked to the "specific conduct underlying the offense of conviction," meaning all "acts comprising the scheme to defraud." *Id.*

We think a similar course is appropriate here and see no basis to distinguish the identical language in the MVRA. The conduct underlying the Jinwrights' conspiracy conviction extended back to 1991, the year the indictment alleges that acts in furtherance of the conspiracy began. As discussed, the district court determined that Mrs. Jinwright participated in the conspiracy—and could reasonably foresee acts in furtherance of it—as early as 1998. As for Mr. Jinwright, the court credited the trial evidence that his pattern of fraudulent conduct began in 1991. This included evidence that beginning in 1991, the Jinwrights' joint return underreported their taxable income and the Jinwrights filed mortgage applications that listed higher income than that reported to the IRS. The district court therefore did not err in including the tax losses for 1991-1993 in Mr. Jinwright's restitution amount.

## VI.

The Jinwrights object to the district court's imposition of a two-level enhancement under section 2T1.1(b)(2) of the Sentencing Guidelines for their use of "sophisticated means." U.S.S.G. § 2T1.1(b)(2). The enhancement applies to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.* cmt. n.4. Such conduct may include "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." *Id.* The district court's deci-

sion to apply the sophisticated means enhancement was not in error.

The Jinwrights' failure to accurately report their income would not alone support imposition of the sophisticated means enhancement. The enhancement requires some means of execution that separates the offense before us from the ordinary or generic. As the Seventh Circuit has explained, the "average criminal tax fraud . . . involves some concealment; 'sophisticated' tax fraud must require more." *United States v. Kontny*, 238 F.3d 815, 820-21 (7th Cir. 2001). On the other hand, a defendant need not utilize the most complex means possible to conceal his fraudulent activities in order for the court to find that he used sophisticated means. *United States v. Madoch*, 108 F.3d 761, 766 (7th Cir. 1997). The court need only find "the presence of efforts at concealment that go beyond (not necessarily far beyond . . . ) the concealment inherent in tax fraud." *Kontny*, 238 F.3d at 821. A sentencing court should consider the cumulative impact of the criminal conduct, for the "total scheme" may be "sophisticated in the way all the steps were linked together." *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003); *see also United States v. Halloran*, 415 F.3d 940, 945 (8th Cir. 2005) (upholding enhancement where "certain aspects of [defendant's] scheme were not especially complex or especially intricate" but "his total scheme was undoubtedly sophisticated").

So it was here. The Jinwrights' scheme spanned many years and involved multiple organizations, including GSC and the Pastors Consortium. The court adopted the presentence report, which identified a variety of sophisticated techniques used by defendants to conceal their tax evasion. The Jinwrights structured their compensation so as to prevent the inclusion of income on their W-2 forms, drawing payments from the GSC operating account, rather than the payroll account. They disguised wages as allowances and reimbursements for which they instructed GSC employees not to issue 1099 forms to disclose additional income to the IRS. They

directed GSC employees to manipulate GSC financial records to conceal their income and misrepresented their financial situation to the IRS in GSC's application for section 501(c)(3) tax-exempt status. The Pastors Consortium provided another elaborate way of concealing income through what the court found was a kickback scheme. Specifically, the court found that there was an implied quid pro quo between the consortium members to exchange thousands of dollars from discretionary church funds to speak at each other's church anniversary events.

Ample trial evidence supported the district court's conclusion that these actions were proven for purposes of sentencing by a preponderance of the evidence. Taken together, the assorted methods of executing the offense involved especially intricate offense conduct that rose to the level of sophisticated means. *See United States v. Wayland*, 549 F.3d 526, 529 (7th Cir. 2008) (holding that scheme of health care fraud, "which lasted nine years and involved a series of coordinated fraudulent transactions, was complex and sophisticated" even if defendant's "individual actions could be characterized as unsophisticated").

Appellants urge, however, that the sentencing court improperly relied on evidence from the trial record that was not included in the presentence reports, such as defendants' use of A.L. Jinwright Ministries as a shell corporation to convert funds donated in support of Mr. Jinwright's ministerial services into additional income. But central to the district court's broad discretion to fashion an appropriate sentence is the ability to find facts and to determine their relevance to the sentencing questions at hand. *See United States v. Dean*, 604 F.3d 169, 174 (4th Cir. 2010). Although Federal Rule of Criminal Procedure 32 identifies information that should be included in the presentence report, we see nothing there that constrains a sentencing judge's discretion to consider facts in the record but outside the PSR, which in this case was necessarily less comprehensive than the 90,000 pages of documen-

tary evidence admitted at trial. Instead, Rule 32(d) requires that the PSR identify "all applicable guidelines" and "any factor relevant to" the "appropriate kind of sentence." Fed. R. Crim. P. 32(d). Here the PSR did just that by specifying the applicable provisions of the Guidelines, including all enhancements relevant to the Jinwrights' sentencing.

It therefore sufficed that the PSR provided notice that sophisticated means was a factor relevant to sentencing and supplied a non-exhaustive list of defendants' sophisticated techniques that amply supported application of the enhancement in and of themselves. And it was well within the court's discretion to supplement the examples identified in the PSR with additional facts adduced at trial, especially because defendants were able to contest the relevance of those facts at the sentencing hearing and the court explained its finding on the record. *See* U.S.S.G. § 6A1.3(a) ("When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor.").

## VII.

The district court imposed a two-level enhancement for defendants' abuse of a position of trust "that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. It is undisputed that as spiritual leaders of the GSC community and custodians of the church's finances, the Jinwrights held a position of trust with respect to GSC's membership. The district court found that they abused their position when committing relevant criminal conduct under U.S.S.G. § 1B1.3, specifically the embezzlement of money from GSC to facilitate the tax evasion offense. As the court found, for three years the Jinwrights routinely instructed Jacqueline Joyner-Jones to forge checks to them from the GSC Women of Faith Ministry. Through this scheme, the Jinwrights unlawfully converted about $60,000 from the GSC coffers and evaded paying taxes on those funds. The Jin-

wrights argue, however, that an abuse of trust enhancement may not be based on relevant conduct under U.S.S.G. § 1B1.3.

We need not pass on the district court's specific justification in isolation, because the wide range of conduct in the record amply supports the enhancement. We may affirm the district court on the basis of "'any conduct [in the record] that independently and properly should result in an increase in the offense level' by virtue of the enhancement." *United States v. Garnett*, 243 F.3d 824, 830 (4th Cir. 2001). Such a basis exists here because GSC was a secondary victim of the tax evasion scheme itself.

It is well settled in our circuit that "whether a defendant held a position of trust must be examined from the perspective of the victim." *United States v. Godwin*, 272 F.3d 659, 671 (4th Cir. 2001). And it is undisputed that the government is the primary victim of the Jinwrights' scheme to avoid paying taxes owed to the IRS. We have recognized, however, that the offense of conviction may harm secondary victims as well. *See United States v. Akinkoye*, 185 F.3d 192, 204 (4th Cir. 1999); *United States v. Turner*, 102 F.3d 1350, 1360 (4th Cir. 1996). Although the Jinwrights urge us not to extend the concept of secondary victims to tax crimes, we are not persuaded that the only possible victim of a tax offense is the government. *See United States v. Bhagavan*, 116 F.3d 189, 193 (7th Cir. 1997) (rejecting the "notion that there can be only one victim of a tax evasion scheme—the United States"). In this case, GSC was victimized by the Jinwrights' efforts to conceal their tax crimes from detection.

The Jinwrights exploited their authority at GSC not only to increase their compensation, but also to defraud the government and to conceal their efforts to evade taxes. A position of trust may "'significantly contribute' to the defendant's execution or obfuscation of the offense simply 'by making the detection of the offense or the defendant's responsibility for

the offense more difficult.'" *United States v. Brack*, 651 F.3d 388, 393 (4th Cir. 2011) (quoting U.S.S.G. § 3B1.3 cmt. n.1). Here, the Jinwrights used their position of influence to enlist GSC employees and board members to conceal a significant portion of their income from the IRS. They directed several GSC finance administrators to pay their non-salary compensation from the GSC operating account and to exclude it from their W-2s. Exercising his authority over financial matters, Mr. Jinwright overruled employee suggestions that extra compensation be disclosed to the IRS on 1099 forms. By instructing Joyner-Jones to forge checks as a source of additional income, the Jinwrights not only embezzled from the church, but also concealed these receipts from the IRS. The district court also found that the Jinwrights told employees to falsify annual reports in order to conceal the percentage of GSC's operating expenses that were attributable to them. These reports were submitted to the IRS with GSC's application for tax-exempt status in furtherance of the conspiracy to defraud the government.

Each of these measures, however, also victimized the GSC congregation, which was financially burdened by the Jinwrights' acts of concealment. In addition to disguising the Jinwrights' total compensation, the falsified reports hid GSC's financial difficulties by offsetting profits for the entire annual period with expenses from only eleven months of the year. As several GSC employees testified, Mr. Jinwright misled the congregation in order to maintain morale and sustain donations to the church. And as the court found at sentencing, he also misrepresented the church's financial health to prevent alterations to the budget and reductions to his compensation. The concealment drove the church deeper into financial crisis by forestalling remedial measures. As the dire financial condition of the church came to the attention of the board, the Jinwrights rebuffed efforts to trim the budget and reduce their compensation. Several board members who called attention to defendants' fraudulent acts were replaced or forced to resign.

The abuse of trust enhancement enables the sentencing court to punish those who wield their power to criminally take advantage of those who depend upon them most. As leaders of GSC, the Jinwrights were entrusted with the spiritual well-being and financial stewardship of their religious community. They exploited the trust of their unsuspecting congregation to conceal criminal acts from the government, as well as the church, and to maintain an extravagant lifestyle lived at the church's expense. We thus affirm the district court's application of the abuse of trust enhancement.

## VIII.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.