**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 23-4486**
_____

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

CORY COLLIN FITZGERALD SANDERS,

Defendant – Appellant.

_____

Appeal from the United States District Court for the District of Maryland, at Baltimore. James K. Bredar, Senior District Judge.  (1:20-cr-00168-JKB-1)

_____

Argued:  January 28, 2025                          Decided:  July 24, 2025

_____

Before THACKER and HARRIS, Circuit Judges, and Elizabeth W. HANES, United States District Judge for the Eastern District of Virginia, sitting by designation.

_____

Affirmed by published opinion. Judge Hanes wrote the opinion, in which Judge Thacker and Judge Harris joined.

_____

**ARGUED:**  Meghan Skelton, SKELTONLAW, LLC, Cabin John, Maryland, for Appellant.  Evelyn Lombardo Cusson, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF:**  Erek L. Barron, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

_____

ELIZABETH W. HANES, United States District Judge, sitting by designation:

A jury convicted Cory Fitzgerald Sanders of wire fraud, submitting false claims, and submitting a false document as a result of a scheme to fraudulently sell video teleconference equipment and related services to the federal government. Sanders appeals his convictions, contending that one of the jury instructions given by the district court misstated the law. Sanders also challenges the district court's sentence. For the reasons stated below, we affirm both Sanders' convictions and his sentence.

I.

Sanders, through his company SandTech, LLC ("SandTech"), contracted with the federal government to supply teleconference equipment and support services. Generally, these contracts obligated Sanders to act as a go-between to procure services or equipment from a third-party and then provide those services or equipment to the government. Sanders won the contracts after bidding on them via the online platform "FedBid." As part of the bidding process, Sanders affirmed that he would supply the requested equipment or services according to the specific terms of the contract. But Sanders failed to do so.

For example, Sanders, via SandTech, won a bid with the Army to supply a year of technical support for a specific web filtering program. He was paid almost $28,000, but then never provided the contracted support, misrepresenting that he had placed an order for maintenance from a third-party when he in fact had not. Sanders stopped communicating with the Army, which was unable to recoup its payment. Sanders also won bids to provide new Cisco video teleconference equipment to the United States Marine Corps. In this instance, Sanders shipped teleconference equipment to the government and was paid for it

after representing that the equipment was brand new and under warranty, and that SandTech was an authorized Cisco distributor. All of these representations were false. The equipment provided was used, licensed to another end user, and not under warranty. Additionally, neither SandTech nor the third parties from which it purchased the equipment were authorized Cisco distributors.

Sanders also misrepresented that his company possessed a certification or a particular certification level with Polycom and Cisco, both third-party companies from which Sanders procured equipment and services. Polycom and Cisco both use a certification process for distributors, in which distributors obtain different certification levels that correspond to a specific client or the particular type of equipment or services that could be distributed. Sanders struggled throughout his time contracting with the federal government to obtain the level of certification required by the contracts. For example, Sanders had completed courses at his prior employer and was therefore an authorized Polycom distributor. This designation did not, however, give Sanders authorization to sell equipment to the federal government or to provide maintenance on equipment. Nevertheless, in 2015 and 2016, Sanders contracted to provide brand new and under-warranty Polycom equipment to the Department of Labor as well as warranties and maintenance. He failed to do so, and Polycom reported to the government that Sanders, via SandTech, was not authorized as a federal distributor and was not authorized to provide maintenance. Eventually, Polycom suspended SandTech from its partner program entirely after learning that it had entered into numerous federal contracts to provide Polycom

3

services and equipment despite not being authorized by Polycom to sell or provide such services.

After a number of his contracts were terminated for cause, Sanders formed a new company, CyCorp Technologies, LLC ("CyCorp"), to continue bidding on federal contracts without the burden of SandTech's poor, and presumably disqualifying, performance record. CyCorp was never an authorized Polycom distributor but was at one point an authorized Cisco distributor with the lowest level of certification.[1] Operating through CyCorp, Sanders again fraudulently entered into several government contracts and falsely represented that CyCorp was a certified distributor of both Polycom and Cisco equipment. At various times, Sanders, on behalf of CyCorp, supplied the government with falsified documents to prove the company possessed certain certifications. For example, Sanders submitted a photoshopped certificate representing that CyCorp was a "Gold Certified Partner" with Cisco when in fact it possessed only the lowest partnership level.[2] Eventually, his use of fraudulent certificates was reported to Cisco and Cisco terminated CyCorp as a Cisco authorized distributor. Throughout the lifespan of this scheme, Sanders repeatedly attempted to register CyCorp as an authorized Cisco distributor by using varying business names, usernames, and addresses designed to avoid detection. These attempts

---

[1] After Polycom terminated SandTech as a partner, Sanders attempted to register CyCorp as a Polycom partner in 2018, using an alternate address, but this application was rejected.

[2] To be a "Gold Certified Partner" with Cisco, a company must have at least twelve employees and significant sales revenue -- CyCorp failed to meet either of these qualifications.

were all briefly successful before Cisco discovered the scheme and terminated all registrations. Following the termination of CyCorp's authorization with both Cisco and Polycom, Sanders continued to enter into contracts to provide Cisco and Polycom equipment and services to the government. At various times, Sanders blind-shipped equipment from non-conforming suppliers to the government to conceal the source of the equipment and continue the illusion of providing authorized equipment. The total loss amount for Sanders' counts of conviction, as determined at sentencing, was $899,150.65.

At trial, Sanders acknowledged that he failed to satisfactorily perform on his contracts with the federal government. Sanders argued that this failure was not willful but rather because he was "in over his head," so his defense centered around whether Sanders "specifically intended to defraud the government." J.A. 1394. Following closing arguments, the district court gave several jury instructions on intent. After deliberation, the jury returned guilty verdicts on fourteen counts and acquitted Sanders of two counts. Sanders' Guidelines range was 46 to 57 months. The district court sentenced Sanders to a 45-month term of imprisonment, and he timely appealed.

## II.

We begin with Sanders' challenge to the jury receiving an instruction that "[w]illful intent or guilty knowledge may be inferred from the secretive or irregular manner in which a transaction is carried out." J.A. 1444. We find no error.

## A.

We review *de novo* "whether the district court's instructions to the jury were correct statements of law." *Emergency One, Inc. v. Am. FireEagle, Ltd.*, 228 F.3d 531, 538 (4th

Cir. 2000).  Our review is not limited to a single instruction, instead, we "consider whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law."  *United States v. Jefferson*, 674 F.3d 332, 351 (4th Cir. 2012) (quoting *United States v. Rahman*, 83 F.3d 89, 92 (4th Cir. 1996)).  Where jury instructions, taken as a whole, incorrectly stated the law, we decide whether the error requires the conviction to be set aside under either a harmless error or plain error standard. *United States v. Smithers*, 92 F.4th 237, 246 (4th Cir. 2024).  However, where jury instructions "construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles," the district court did not err, and we need not determine whether harmless error or plain error review applies.  *Id.* at 248 (quoting *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011)).[3]

## B.

The district court gave seven instructions specifically addressing the intent element. For example, the jury was instructed that "the government must prove that the defendant acted willfully," which means "to act with knowledge that one's conduct is unlawful and with the intent to do something the law forbids, that is to say, with the bad purpose to

---

[3] At oral argument, some confusion arose over whether -- if error existed -- harmless error or plain error review applied.  At trial, Sanders objected to the challenged instruction on sufficiency grounds.  But on appeal, Sanders challenges the legality of the instruction rather than its applicability.  Given this posture, Sanders failed to preserve his argument before the district court and his objection would be subject to plain error review.  *See United States v. Zayyad*, 741 F.3d 452, 459 (4th Cir. 2014).  However, in its briefing, the Government appears to concede that the less-exacting harmless error standard should apply here.  Because we find no error in the instructions taken as a whole, we need not solve this procedural puzzle.

disobey or disregard the law." J.A. 1442. The jury was also instructed that "conduct was not 'willful' if it was due to negligence, inadvertence, or mistake." J.A. 1443. Sanders does not challenge six of these instructions and we find no error in these instructions, which were provided both before and after the challenged instruction.

The sole challenged instruction stated "[w]illful intent or guilty knowledge may be inferred from the secretive or irregular manner in which a transaction is carried out." 1 L. Sand, J. Siffert, W. Loughlin, S. Reiss, S. Allen, J. Rakoff, & D. Epstein, Modern Federal Jury Instructions–Criminal ¶ 6.06 § 6-19. Sanders argues that this instruction improperly equated irregularity with willfulness. We acknowledge that the challenged instruction, if read in isolation, could run the risk of confusing the jury. But, as Sanders acknowledges, the bulk of the district court's jury instructions, coming "immediately before and after" this one instruction, adequately explained the requisite intent and clearly articulated the required *mens rea*. *United States v. Blankenship*, 846 F.3d 663, 679 (4th Cir. 2017). Although Sanders argues that the instructions were contradictory, we disagree, finding instead that the unchallenged instructions contextualized the challenged instruction, clarifying the required intent and specifying that, while circumstantial evidence could be considered, "conduct was not 'willful' if it was due to negligence, inadvertence, or mistake." J.A. 1443. Accordingly, the instructions "construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *United States v.*

7

*Hassler*, 992 F.3d 243, 246 (4th Cir. 2021) (quoting *United States v. Kivanc*, 714 F.3d 782, 794 (4th Cir. 2013)).  For the reasons set out above, we affirm Sanders' conviction.

III.

Sanders next challenges his sentence, arguing that the district court erred by applying a sentencing Guidelines enhancement for using "sophisticated means" to carry out his fraud.  U.S.S.G. § 2B1.1(b)(10)(C).  Sanders claims that his fraud lacked sophistication, making the sentencing enhancement inapplicable to his conduct.  For the reasons set out below, we find no error.

A.

"When reviewing a criminal sentence, we first ensure that the district court did not commit significant procedural error, such as incorrectly calculating the Guidelines range." *United States v. White*, 850 F.3d 667, 674 (4th Cir. 2017), *cert. denied*, 582 U.S. 909 (2017).  We review the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Strieper*, 666 F.3d 288, 292 (4th Cir. 2012). "Whether a defendant's conduct involved sophisticated means is a factual inquiry that we review for clear error."  *White*, 850 F.3d at 675 (citing *United States v. Adepoju*, 756 F.3d 250, 256 (4th Cir. 2014)).  "When reviewing for clear error, the district court's determination need only be 'plausible in light of the record viewed in its entirety.'" *United States v. Freitekh*, 114 F.4th 292, 320 (4th Cir. 2024) (quoting *United States v. Gross*, 90 F.4th 715, 722 (4th Cir. 2024)).  We review any legal interpretation of the term "sophisticated means" *de novo*.  *See United States v. Boler*, 115 F.4th 316, 321 (4th Cir. 2024).

8

The relevant Guideline "directs the sentencing court to increase the offense level by two levels if 'the offense otherwise involved sophisticated means.'" *United States v. Wolf*, 860 F.3d 175, 199 (4th Cir. 2017) (quoting U.S.S.G. § 2B1.1(b)(10)(C)). The commentary to the Guideline provides that "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n.9(B). The commentary also provides two examples "warranting application of the sophisticated-means enhancement, including '[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts'" and "locating the main office of [a telemarketing] scheme in one jurisdiction but locating soliciting operations in another." *Wolf*, 860 F.3d at 199; U.S.S.G. § 2B1.1 cmt. n.9(B).[4]

We defer to the Guidelines' commentary only in limited circumstances. *Boler*, 115 F.4th at 322. For deference to be warranted, a regulation, such as the Sentencing Guidelines, must first be genuinely ambiguous. *Id.* If it is, we then must determine whether the agency's interpretation -- here, the Commission's commentary -- comes within the regulation's "zone of ambiguity." *Id.* (quoting *Kisor v. Wilkie*, 588 U.S. 558, 576 (2019)). Even where an interpretation falls within that zone, we still must also "make an independent inquiry into whether the character and context of the agency interpretation

---

[4] The district court did not explicitly reference the commentary in finding that the sophisticated means enhancement applied. However, the parties repeatedly discussed the commentary's examples and definition in briefing. Sanders argues that the commentary's examples and definition demonstrate that application of the enhancement was erroneous. Accordingly, we must first determine whether we may properly defer to the commentary.

9

entitles it to controlling weight." *Kisor*, 588 U.S. at 576. We do this by examining whether the interpretation (1) is the "official position" of the agency, (2) implicates the agency's substantive expertise, and (3) reflects the agency's "fair and considered judgment." *Id.* at 576–79 (quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997)).

1.

We begin with determining whether the Sentencing Guideline is genuinely ambiguous. "In evaluating ambiguity, we must consider a term's ordinary meaning and employ the various canons of statutory interpretation, including considering the specific context in which the language is used, and the broader context of the regulation as a whole." *United States v. Mitchell*, 120 F.4th 1233, 1241 (4th Cir. 2024) (internal quotation marks omitted). The parties observe that dictionary definitions fail to clarify what the term, "sophisticated means," or its components, mean. The phrase "sophisticated means" is not defined in any dictionary. The individual components of the phrase have multiple and varied definitions. For example, Merriam-Webster defines "sophisticated" as "deprived of native or original simplicity: such as: (a) highly complicated or developed [or] (b) having a refined knowledge of the ways of the world cultivated especially through wide experience." *Sophisticated*, Merriam-Webster, https://perma.cc/L554-XQ33 (last visited June 13, 2025). It defines "means," in relevant part, as "something useful or helpful to a desired end," or "resources available for disposal." *Means*, Merriam-Webster,

10

https://perma.cc/9C2U-R9SH (last visited June 13, 2025).  Further, no relevant statutes or regulations define the phrase.[5]

Based upon this review, "[t]here is 'no single right answer' to the meaning of [sophisticated means] based on its plain reading." *Boler*, 115 F.4th at 324–25 (quoting *Kisor*, 588 U.S. at 575).  Additionally, the context in which the term is used offers little guidance on its meaning.  The sophisticated means enhancement follows two other enhancements, one where a defendant relocated a fraudulent scheme "to evade law enforcement or regulatory officials," and one where "a substantial part of a fraudulent scheme was committed from outside the United States."  U.S.S.G. § 2B1.1(b)(10)(A)–(B).  While the first two subsections both relate to location-based characteristics, the sophisticated means enhancement is much more general and is not informed by the meaning of the preceding specific phrases.  *See Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) (describing the typical interpretative practice where general words following specific words are construed according to the preceding specific terms).  Review of the history of the Guideline as well as the Guideline's purpose also fails to illuminate

---

[5] As the Government points out, materially identical definitions of sophisticated means appear elsewhere in commentary to the Guidelines, but the Guidelines themselves never define the term. *See* U.S.S.G. §§ 2T1.1, 2T1.4, 2T3.1.

the meaning of the phrase. Accordingly, after employing the traditional tools of interpretation, we conclude that "sophisticated means" is genuinely ambiguous.

2.

Having found genuine ambiguity, we next consider whether the commentary's definition falls within the "zone of ambiguity." *Kisor*, 588 U.S. at 576. The commentary's definition of "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense" is a reasonable interpretation by the Commission of the phrase "sophisticated means." U.S.S.G. § 2B1.1 cmt. n.9(B). It closely tracks one of the dictionary definitions of "sophisticated," and circumscribes the meaning of the Guideline rather than expanding it.

Additionally, "[t]he character and context of the commentary entitle it to controlling weight." *Boler*, 115 F.4th at 328. The Commission has defined "sophisticated means" in analogous contexts since 1989. *See* U.S.S.G. § 2T1.1 cmt. n.6 (1989). And the definition applicable here has been the official position of the Commission since 2001. U.S.S.G. § 2B1.1 cmt. n.6(B) (2001). Further, as we have noted before, the commentary "reflects the 'substantive expertise' of the Commission and its 'fair and considered judgment.'" *Boler*, 115 F.4th at 328 (quoting *Kisor*, 588 U.S. at 577, 79). Therefore, deference to the commentary is proper in determining whether Sanders used sophisticated means.

B.

With such deference in mind, we reiterate that the commentary defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n.9(B).

12

The provided examples are: (1) "in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction," and (2) "hiding assets or transactions, or both, through the use of fictious entities, corporate shells, or offshore financial accounts." *Id.* "[A]n enhancement can only be applied when there is proof of complexity beyond the 'minimum conduct required to establish [fraud] in its simplest form.'" *United States v. Savage*, 885 F.3d 212, 228 (4th Cir. 2018) (quoting *Adepoju*, 756 F.3d at 257). However, a defendant need not use "the most complex means possible to conceal his fraudulent activities in order for the court to find that he used sophisticated means." *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012) (citing *United States v. Madoch*, 108 F.3d 761, 766 (7th Cir. 1997)).

Sanders argues that the district court clearly erred in applying the sophisticated means enhancement because his conduct was unsophisticated and never went beyond the minimum conduct required to establish fraud. We disagree. While the individual pieces of this scheme may appear to be, as Sanders argues, relatively straightforward and unsophisticated, the scheme's ultimate sophistication is revealed by "the way all the steps were linked together." *Jinwright*, 683 F.3d at 486 (quoting *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2023)). The Government presented evidence that Sanders fraudulently entered contracts with multiple government entities over a period of five years. *See Jinwright*, 683 F.3d at 486 (affirming application of enhancement where the fraudulent scheme spanned many years and multiple organizations); *see also United States v. Feaster*, 798 F.3d 1374, 1381 (11th Cir. 2015) (noting that for the enhancement the length of time of the fraud adds to the sophistication). When bidding on federal contracts, Sanders used

13

numerous variations of his name to give the appearance of his company having multiple employees. Then he formed a new company after his original business was flagged for a negative performance history, using an alternate address to register this new company. *See Freitekh*, 114 F.4th at 320–21 (noting that creating a second entity supported the application of the sophistication enhancement). Further, Sanders supplied false certifications to government representatives and used various usernames and addresses to attempt to gain re-certifications. *See United States v. Allan*, 513 F.3d 712, 714 (7th Cir. 2008) (finding that "fabricated identities, email addresses, and telephone numbers, which [the defendant] listed on forms so that any effort to verify the phony purchasers would be routed back to him" justified the sophisticated means enhancement). Finally, Sanders blind-shipped product to agencies with which he contracted, concealing his product source. This conduct went beyond the "minimum conduct required to establish [fraud] in its simplest form." *Adepoju*, 756 F.3d at 257. Upon review of such a record, the district court's finding of sophisticated means was certainly plausible. Accordingly, the district court did not clearly err in finding the presence of "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n.9(B).

IV.

For the reasons set out above, the judgment of the district court is

*AFFIRMED.*

14