**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-4384

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

KEITH ARTHUR VINSON,

Defendant – Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Asheville. Martin K. Reidinger, District Judge. (1:12-cr-00020-MR-DLH-5)

Argued: October 28, 2016                           Decided: March 24, 2017

Before MOTZ, KING, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Motz and Judge Duncan joined.

**ARGUED:** John Clark Fischer, RANDOLPH AND FISCHER, Winston-Salem, North Carolina, for Appellant. Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Jill Westmoreland Rose, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

KING, Circuit Judge:

In October 2013, Keith Arthur Vinson was convicted in the Western District of North Carolina of various offenses arising from his leadership of schemes wherein fraud was systematically utilized to keep his real estate empire afloat. Vinson has appealed, contending primarily that the prosecution presented insufficient evidence of the crimes alleged. He also maintains that the trial court gave the jury an erroneous and prejudicial willful blindness instruction, and that his aggregate sentence of 216 months is substantively unreasonable. As explained below, we reject each of his contentions and affirm.

I.

A.

From approximately 2010 and culminating in this prosecution, the FBI, the IRS, and the United States Attorney in western North Carolina conducted a protracted investigation into the fraudulent activities discussed herein. Prior to the initial indictment against Vinson, the government had already convicted several of his cohorts and obtained their cooperation. Those men included George "Buddy" Greenwood, David G. Smith, and Robert Craig Gourlay. For example, in February 2011, the grand jury in Asheville indicted Greenwood for misapplication of bank funds and money laundering. Greenwood pleaded guilty to those charges on June 16, 2011. In October 2011, the United States Attorney filed an information charging Smith with a conspiracy to commit

2

various offenses and Gourlay with misapplication of bank funds and money laundering. Smith and Gourlay pleaded guilty on November 1, 2011, to the charges against them.

Vinson was initially indicted by the grand jury in April 2012 on multiple federal charges, including conspiracy, bank and wire fraud, and money laundering. In addition to Vinson, that indictment charged Avery "Buck" Cashion III and his wife, Joan Cashion, plus Raymond M. Chapman and Thomas E. Durham, Jr. A superseding indictment, returned in early December 2012, lodged charges against Vinson, Buck Cashion, Chapman, Durham, and two additional defendants, George M. Gabler and Aaron Ollis.

In January 2013, the charges in the initial indictment against Joan Cashion were dismissed. Soon thereafter, in February 2013, the United States Attorney filed an information charging Andrew Hager with conspiracy to commit offenses against the United States. Hager pleaded guilty to that charge on March 11, 2013. On September 18, 2013, Buck Cashion and Chapman pleaded guilty to the conspiracy charges in the superseding indictment. Less than a week later, on September 24, 2013, Gabler pleaded guilty to an information charging misprision of a felony. Durham and Ollis also pleaded guilty on that occasion, to conspiracy charges lodged in the superseding indictment. Pursuant to agreements with the United States Attorney, those defendants cooperated in the ongoing investigation and related prosecutions.

On October 1, 2013 — fifteen months after the initial indictment and only a week after several of the defendants had pleaded guilty — the grand jury returned another superseding indictment, the operative indictment in this appeal (the "Indictment"). The Indictment named Vinson as the only defendant, but several of those who had pleaded

3

guilty were identified as unindicted coconspirators. The Indictment alleged thirteen charges against Vinson, as follows:

- Count One — That Vinson conspired with Buck Cashion, Chapman, Ollis, Hager, and others to commit bank fraud, in contravention of 18 U.S.C. § 1349;

- Count Two — That Vinson conspired with Cashion, Chapman, Ollis, Hager, Greenwood, and others to commit offenses against and to defraud the United States, in violation of 18 U.S.C. § 371;

- Counts Three, Four, Five, Six, and Ten — That Vinson, on five occasions, aided and abetted the misapplication of bank funds, in violation of 18 U.S.C. §§ 656 and 2;

- Counts Seven and Eight — That Vinson committed and aided and abetted two wire fraud offenses affecting a bank, in violation of 18 U.S.C. §§ 1343 and 2;

- Count Nine — That Vinson conspired with Cashion, Chapman, Ollis, Hager, Durham, Gourlay, Smith, and others to commit offenses against and to defraud the United States, in contravention of 18 U.S.C. § 371;

- Count Eleven — That Vinson conspired with Cashion, Chapman, and others to commit money laundering, in contravention of 18 U.S.C. § 1956(h); and

- Counts Twelve and Thirteen — That Vinson committed and aided and abetted two money laundering offenses, in violation of 18 U.S.C. §§ 1957 and 2.

Vinson was the only alleged conspirator who elected to go to trial. Vinson's jury trial on the Indictment began in Asheville on October 7, 2013, just a week after the Indictment was returned. Several of his cohorts testified for the prosecution, including Buck Cashion, Gourlay, and Hager. The prosecution called at least twenty-six witnesses — such as coconspirators, banking officials, and victims of the alleged criminal activities — and introduced hundreds of documents.

4

B.

The trial evidence emphasized Vinson's ongoing efforts to defraud various banks and others in seeking to salvage his floundering real estate empire, particularly the Seven Falls Golf and River Club in western North Carolina (the "Seven Falls development," or "Seven Falls").[1]  Vinson acted through various entities, including Seven Falls LLC, of which he was the principal.  In his efforts, Vinson utilized a dizzying array of fraudulent activities, including those referred to herein as the Lot Loan Scheme, the Plastics Plant Scheme, the Check Fraud Scheme, the Burnett Straw Loan, the Worlund Straw Loan, the Zeiger Straw Loan, and the Queens Gap Scheme.  Vinson's fraudulent activities contributed to the insolvency of two FDIC-insured banks in western North Carolina — the Bank of Asheville ("BOA") and Pisgah Community Bank ("PCB") — leading the FDIC to become the Receiver for each failed bank.

1.    Background

Beginning in about 2006, Vinson implemented a plan to turn approximately 1,600 acres of North Carolina property into the Seven Falls development.  Seven Falls was to include luxury homes and condominiums near and around an Arnold Palmer championship golf course outside Hendersonville.  In about August 2006, Vinson sought a $6 million land acquisition and development loan (an "A&D loan") for Seven Falls from the National Bank of South Carolina ("NBSC").  To consummate the A&D loan

---

[1] Because we are reviewing the sufficiency of the proof of criminal offenses, we recite the evidence in the light most favorable to the prosecution. *See United States v. Hassan*, 742 F.3d 104, 115 (4th Cir. 2014).

transaction with NBSC, Vinson needed $2 million in seed money, which he did not have on hand. Vinson thus sought assistance from his friend Buck Cashion, a real estate investor and private money lender. Vinson and Cashion had previously been involved together in other business deals, including two high-end housing developments located near Asheville. Vinson advised Cashion, "I'll make it very much worth your while if you'll borrow $2 million for me" for seed money on the NBSC A&D loan. *See* J.A. 967.[2] Cashion agreed to assist Vinson and promptly borrowed $2 million from BOA. In return for Cashion's help, Vinson promised to pay Cashion $4 million.

In January 2007, Vinson obtained additional funds from NBSC for use in the Seven Falls development, increasing the A&D loan from $6 million to about $25 million. Vinson used $4 million of the A&D loan to purchase a dairy farm adjacent to Seven Falls that was to be used for an Arnold Palmer golf academy and another luxury housing development. By the summer of 2007, road construction had commenced at Seven Falls. Around that time, Vinson needed yet more money but ran up against NBSC's loan limit with respect to a single borrower — a restriction imposed under federal banking regulations that constrain how much a particular bank can lend to one borrower.[3] To

---

[2] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

[3] The loans-to-one-borrower regulation provides that a "national bank's or savings association's total outstanding loans and extensions of credit to one borrower may not exceed 15 percent of the bank's or savings association's capital and surplus." *See* 12 C.F.R. § 32.3. In order to apply, that regulation aggregates all loans made to a borrower with other loans made to the borrower's related businesses. *Id.* § 32.5(a).

raise additional funds for Seven Falls, Vinson asked Cashion to buy from Vinson the recently acquired dairy farm, which had been appraised at $6.8 million.

In connection with the dairy farm transaction, Cashion used an entity called Zeus Investments, LLC ("Zeus") — which he owned with Chapman and Gabler — to borrow $4 million from NBSC and consummate purchase of the farm.[4] Cashion and Zeus had no intention of retaining the farm, however, and Cashion agreed with Vinson that Zeus would simply hold it for thirty days. At that point, Cashion was anticipating the $4 million payment that Vinson had promised in return for Cashion's assistance in obtaining the $2 million in seed money on the NBSC A&D loan. The promised $4 million payment from Vinson, however, was never made.[5]

In June 2007, Vinson conducted a Founder's Day promotion of Seven Falls at the Biltmore Estate near Asheville. At that lavish event — which included an appearance by Arnold Palmer himself — approximately 500 guests enjoyed alcohol under a "huge festive tent" and witnessed the ribbon cutting for Palmer's "fabulous golf academy." *See* J.A. 1071. The attendees also received discounts and special benefits for their purchases

---

[4] Chapman, a real estate investor and private money lender, had previously partnered with Cashion in several real estate ventures. According to the prosecutors, Cashion was the "salesman" and Chapman was the "numbers guy"; together they loaned money at high rates for risky financial ventures. *See* J.A. 79. Gabler was a CPA who promoted Seven Falls to prospective investors. Chapman and Gabler invested substantial sums of money in Seven Falls.

[5] Between 2006 and 2009, Cashion secured approximately fifty loans on Vinson's behalf. Vinson failed to repay Cashion for more than $16 million of that debt, and Cashion in turn failed to repay the various banks involved.

7

of Seven Falls lots, including 100% financing of lot purchases through NBSC. After the event, Vinson hosted a Kenny G concert in Asheville. Although the funds Vinson raised at the Founder's Day event were to go toward repayment of the A&D loan from NBSC, "[f]or some reason that money didn't get taken out." *Id.* at 999. Indeed, NBSC was never repaid for the A&D loan.

By spring 2008, the lot sales at Seven Falls had dwindled due to winter weather and the worsening economy. Vinson was thus unable to pay his employees and contractors, and all work soon ceased on the Seven Falls infrastructure. In April 2008, Vinson approached Cashion and asked for help paying "some lien people." *See* J.A. 1007. By fall 2008, one of Vinson's employees was "pretty much on the phone eight hours a day with vendors trying to explain why their checks bounced," as well as dealing with vendors who demanded payment. *Id.* at 332.

### 2. The Lot Loan Scheme

In 2008, in order to satisfy financial obligations related to Seven Falls and continue with its development, Vinson and his cohorts sought to raise large sums of money by fraudulently obtaining additional loans on approximately twenty-five Seven Falls lots (the "Lot Loan Scheme"). That scheme, which underlies the bank fraud conspiracy offense charged in Count One of the Indictment, stemmed from Buck Cashion's failed attempt to obtain a $2.5 million A&D loan from PCB.[6] PCB was a

---

[6] Count One charged a conspiracy under 18 U.S.C. § 1349 to commit bank fraud in two respects: by defrauding a bank, in contravention of 18 U.S.C. § 1344(1), and by obtaining bank funds by false and fraudulent pretenses, in violation of § 1344(2).

8

fairly new bank in Asheville, and Buck and Joan Cashion had invested in it. Buck Cashion and Chapman approached Gourlay, PCB's Chief Credit Officer, and Durham, PCB's President, seeking the $2.5 million A&D loan for Vinson. Gourlay explained that PCB could not make a single loan for such a large sum, but suggested instead a scheme that would utilize a series of fraudulent lot loans and thereby obtain $2.5 million to fund the Seven Falls development. Cashion and Chapman relayed the proposed scheme to Vinson.

As Cashion explained at trial, he informed Vinson that "we're going to have to circumvent the way the bank is doing it" and asked "do you want to do that?" *See* J.A. 1016. According to Cashion, Vinson promptly "said yes." *Id.* Cashion explained that he had "to have [Vinson's] approval for the lot program because it's his lots and it's his lot program." *Id.*

After Gourlay provided the corrupt idea, Vinson, Cashion, Chapman, and others structured and carried out the Lot Loan Scheme. Pursuant thereto, Vinson entered into sales contracts with straw borrowers, who obtained loans from PCB and other banks to purchase undeveloped Seven Falls lots, with the loan proceeds going to Vinson and his creditors. Vinson hired Hager to find lenders that would make the loans. Among the straw borrowers were Cashion, Chapman, Gabler, and Hager himself, plus Kostas Rantzos and Nicholas Dimitris.[7]

---

[7] Several of the straw borrowers, including witnesses Rantzos and Dimitris, corroborated how the loan transactions in the Lot Loan Scheme were handled and the terms thereof. Although Rantzos was not prosecuted, the United States Attorney charged (Continued)

9

The straw borrowers represented themselves to the lenders as bona fide purchasers. Nevertheless, under side agreements between Vinson and the straw borrowers, Vinson was allowed to continue marketing the Seven Falls lots to other buyers and to repurchase the lots at any time. Meanwhile, the straw borrowers understood that Vinson would repurchase the lots within two years if no other buyers emerged. Vinson also agreed to make the straw borrowers' loan payments for two years, as well as to pay kickbacks directly to the straw borrowers by way of monthly payments in sums equal to 1% to 2% of their loan balances.

The side agreements in the Lot Loan Scheme included attractive "seller concessions" for the straw borrowers, constituting 25% of the sales price of a given Seven Falls lot. The straw borrower then obtained a loan equal to 75% of the sales price, provided no funds for a down payment at the property closing, and nevertheless received credit for a 25% down payment. The loan committee of the lender bank was thereby misled into concluding that the loan-to-value (the "LTV") ratio on the lot loan transaction was 25:75, the minimum acceptable ratio without special approval.[8] The seller

_____

Dimitris by information with a conspiracy offense. Dimitris pleaded guilty, was sentenced to prison, and cooperated with the prosecutors.

[8] An LTV ratio is the ratio "between the amount of a mortgage loan and the value of the property pledged as security for the mortgage," which lenders consider before approving a loan or mortgage. *See Loan-to-Value Ratio*, Black's Law Dictionary (10th ed. 2014).

concessions were intentionally omitted from several appraisal documents and HUD-1 settlement statements.[9]

The Lot Loan Scheme involved "shopping" the loans to various lenders without disclosing that the borrowers were obtaining additional loans elsewhere. The closings were timed in quick succession so that the borrowers could obtain loans at different banks without the lenders learning of the other transactions. The borrowers thereby concealed substantial new liabilities that the lenders would have taken into account in assessing the borrowers' ability to repay the loans. Emails from Hager to Vinson confirm that Vinson was fully informed when his various accomplices moved loan applications from bank to bank and substituted the names of borrowers to suit their purposes. The schemers also withheld information from the lenders that would have caused the loans to be aggregated with other Seven Falls lot loans in applying the lenders' loans-to-one-borrower limits.

Between April and July 2008, Vinson and his cohorts closed the loans that were part and parcel of the Lot Loan Scheme, including loans from PCB, BOA, Old Town Bank, Community Bank of Rowan, Southern Community Bank and Trust, and Branch Banking and Trust. At trial, Old Town Bank officials explained that they would not have approved any loans on Seven Falls lots had they been aware of the seller concessions, Vinson's various commitments to pay loan costs, and other undisclosed promises made by Vinson, such as repurchases of the lots within two years.

---

[9] A HUD-1 settlement statement is a standard government-approved form used to itemize fees and services that a lender charges a borrower closing a loan to purchase or refinance real estate. *See* 12 U.S.C. § 2603(a).

11

Although PCB's Gourlay understood that the lot loans made by PCB as part of the Lot Loan Scheme were a proxy for the $2.5 million A&D loan that PCB had to deny, the PCB loan committee was unaware of the actual purpose of the lot loans and the complete terms of the transactions. For example, Kerry Friedman, a member of PCB's board of directors and its loan committee, confirmed that the board "had no idea that there were relationships . . . with [Vinson] in connection with the loans [they] were approving." *See* J.A. 1715-19.

The former loan officer who handled BOA's lot loans, Samuel "Eric" Morris, was disturbed to find that initial straw borrowers did not bring their 25% down payments on the lot purchases to the loan closings, because he knew that the BOA loan committee had predicated its loan approvals on their promises to do so. Morris relayed his concerns to Greenwood, the President of BOA, who instructed Morris to nevertheless close the loans. In July 2008, Morris handled additional straw borrower loans for Seven Falls lots. Despite having been assured that those borrowers would be paying their 25% down payments, Morris learned that the seller concessions had again been granted. As a result, Morris advised the borrowers that BOA would not close the lot loans. Greenwood, however, overruled Morris and instructed him to close them. Although the BOA loan committee approved the Seven Falls lot loans, the committee members were never made aware of the fact that the loans were made to straw borrowers for Vinson's benefit.[10]

_____

[10] In October 2008, Greenwood had to complete a questionnaire on BOA's behalf for the banking regulators. When requested to identify all extensions of credit for the (Continued)

To maximize the available loan proceeds, Vinson and his cohorts hired real estate appraisers — often conspirator Ollis — who provided inflated appraisals of the Seven Falls lots. The false appraisals usually compared other Seven Falls lots, which also had exaggerated values, to justify their valuations. Additionally, the appraisals mischaracterized Seven Falls' level of completed construction, concealed the seller concessions, and failed to disclose the fact that the Lot Loan Scheme transactions were not being made at arms-length. Oftentimes, the inflated appraisals conflicted with lower values reflected elsewhere, such as on deeds and in property tax records. In an email to Vinson on February 19, 2009, Ollis warned that the failure to properly document the higher, inflated land values "creates a problem as far as any records are concerned." *See* J.A. 6830. Vinson replied, "Good advice." *Id.*

Vinson personally attended many of the closings in the Lot Loan Scheme, and, pursuant thereto, raised about $10 million for his use on the Seven Falls development. As Cashion testified:

> Everybody worked for [Vinson,] not necessarily directly or indirectly, but everybody came to him . . . . So everything we were doing to get money had to go through him on a daily basis and it did. . . . [O]n every single transaction, I called and talked to [Vinson] about it.

*See* J.A. 1203.

---

benefit of persons not identified on the pertinent notes — which included the various Lot Loan Scheme-related notes — Greenwood falsely wrote "none." *See* J.A. 7744.

13

### 3. The Plastics Plant Scheme

By August 2008, Vinson and Buck Cashion had each exceeded BOA's loans-to-one-borrower limit. In order to obtain additional funding for the struggling Seven Falls development, Vinson sought to sell — to a straw purchaser — a closed plastics plant that he owned near Seven Falls (the "Plastics Plant Scheme"). The Indictment alleges two offenses relating to the Plastics Plant Scheme, the Count Two conspiracy[11] and the Count Three misapplication of bank funds offense.

Vinson, Buck Cashion, Chapman, and BOA's Greenwood schemed to obtain funds for Seven Falls by arranging for the straw sale of the plastics plant to Joan Cashion and Chapman. Greenwood knew that Vinson, Chapman, and Buck Cashion had invested in Seven Falls, but Greenwood concealed that fact from the BOA loan committee to subvert the bank's loans-to-one-borrower limit. Instead of using the loan funds from the straw sale for the stated purpose of short-term investment in Seven Falls, the proceeds of BOA's loan were instead used to pay off outstanding Seven Falls-related loans, to the benefit of Vinson. On August 18, 2008, the plastics plant loan was closed by BOA, carrying out the Plastics Plant Scheme and securing a $1.7 million haul for Vinson.

---

[11] Count Two charged a conspiracy under 18 U.S.C. § 371 to defraud the United States and thereby impair the functions of the FDIC, as well as to commit offenses against the United States. Those offenses included making a false entry in a bank record, in contravention of 18 U.S.C. § 1005; misapplication of bank funds, in violation of 18 U.S.C. § 656; wire fraud affecting a bank, in contravention of 18 U.S.C. § 1343; and bank fraud, in violation of 18 U.S.C. § 1344. The Count Two conspiracy involved not only the Plastics Plant Scheme, but also the Check Fraud Scheme, the Burnett Straw Loan, and the Queens Gap Scheme.

### 4. The Check Fraud Scheme

Simultaneous with the foregoing events, Vinson was engaged in a scheme that involved bouncing and kiting checks to various banks, thereby obtaining by fraud substantial sums of money (the "Check Fraud Scheme").[12] The Check Fraud Scheme was the subject of three charges in the Indictment, i.e., the Count Two conspiracy and the misapplication of bank funds offenses charged in Counts Four and Five.

On August 18, 2008, Vinson wrote a $400,000 check to Zeus, drawn on a Seven Falls account in Vinson's name at BOA. When the Zeus check was written, however, the balance in the Seven Falls account was around $100,000, as Vinson then knew. Instead of holding or rejecting the $400,000 check, BOA's Greenwood directed a bank employee to honor it, contributing to an overdraw of Vinson's Seven Falls account by about $308,000. Greenwood, however, only had authority to approve insufficient funds checks of $50,000 or less. Almost four months later, on December 31, 2008, Greenwood again exceeded his authority at BOA and approved a loan to Vinson of $308,000 to cover the shortfall in his account.[13] That loan to Vinson was belatedly presented to BOA's loan

---

[12] Check kiting is generally described as "[t]he illegal practice of writing a check against a bank account with insufficient funds to cover the check, in the hope that the funds from a previously deposited check will reach the account before the bank debits the amount of the outstanding check." *See Check-Kiting*, Black's Law Dictionary (10th ed. 2014).

[13] John Hamrick, BOA's Chief Credit Officer, confirmed that Greenwood, as BOA's President, possessed the authority to approve a secured loan of up to $300,000 and an unsecured loan of up to $150,000. Any loan exceeding Greenwood's authority required prior approval of the loan committee. Because the $308,000 loan to Vinson was made without prior committee approval, it was an unauthorized loan.

committee in early January 2009. Faced with the fact that the end-of-year books of BOA would otherwise reflect either a $308,000 loss or unauthorized loan, the committee approved the loan to Vinson. Steve Cogburn, the loan committee chair, acknowledged that, by the time Greenwood secured the committee's approval, BOA's money had been lost and would never be repaid.

Vinson also obtained funds from other banks by check kiting and using fraudulent checks. On December 9, 2009, Vinson had his wife sign a check on her credit union account, which then had a balance of only $151. Vinson lacked signing authority for the credit union account, which his wife used for personal expenses only. Soon after receiving the signed blank check, Vinson made it payable to Seven Falls LLC in the sum of $95,632.52. Vinson promptly deposited that check to cover an overdrafted Seven Falls account at BOA that had a negative balance of $95,631.52.

Three days later, on December 12, 2009, Vinson wrote a $500,000 check on an account at the First Bank of Avon that contained a balance of only $4,102.27. Vinson deposited the Bank of Avon check into a BOA account he shared with his wife. When BOA received the $500,000 bad check, a subordinate asked Greenwood whether he was "seriously going to . . . deposit it and accept it." *See* J.A. 1439. Greenwood laughingly replied in the affirmative, saying that there "was probably about a 20 percent chance it might be good." *Id.* Vinson promptly used the $500,000 for his own benefit. For example, he deposited $95,000 into a Seven Falls account and $113,000 into a Cashion account, both at BOA. Vinson also used $206,000 to make overdue payments to BOA on Seven Falls-related loans.

16

After ascertaining that Greenwood and BOA had given Vinson immediate credit for his fraudulent $500,000 Bank of Avon check, BOA's Hamrick sensed trouble and prepared a list of BOA loans that were secured by lots at Seven Falls. That list revealed that BOA had made more than $14 million in Seven Falls loans that were then outstanding, well over the bank's loans-to-one-borrower limit with respect to Vinson. Vinson's $500,000 fraudulent check was bounced by the Bank of Avon, and BOA was obliged to report that check and the various straw borrower lot loans to the regulating agencies. That report caused BOA's rating by the banking regulators to plummet.

### 5. Other Straw Loans

On top of using several straw borrowers to carry out the Lot Loan Scheme, Vinson solicited the assistance of other straw borrowers to obtain additional loan funds. Those other straw borrowers included Charles Burnett, Edward Worlund, and Betty Zeiger.

### a. The Burnett Straw Loan

In March 2009, Hager met with Burnett, who specialized in obtaining funding in situations where banks would no longer lend to a commercial enterprise. During that meeting, Vinson called and asked Burnett to act as the straw borrower on a $500,000 loan from BOA for the benefit of Vinson (the "Burnett Straw Loan"). The Burnett Straw Loan served as underpinning for four offenses charged in the Indictment — the Count

17

Two conspiracy, the Count Six misapplication of bank funds offense, the Count Eleven money laundering conspiracy,[14] and the Count Twelve money laundering offense.

As collateral for the Burnett straw loan, Vinson provided a lot in Seven Falls. To assist with the scheme, Ollis prepared a fraudulent appraisal of the lot, making it appear that Burnett was borrowing no more than 75% of the value of the collateral, thereby satisfying the 25:75 LTV ratio. Ollis appraised Burnett's lot at $853,000, but the loan was to be for only $500,000. In exchange for Burnett's services, Vinson paid Burnett a kickback of $40,000. Burnett and Vinson also agreed that, if Vinson failed to repay the loan within sixty days, Burnett would be entitled to $10,000 per month for up to four months.

When Hager approached BOA loan officer Morris about the Burnett Straw Loan, Morris said that BOA had had its "fill of Seven Falls lot loans" and that Morris was "not going to look at it." *See* J.A. 940. Accordingly, Morris recommended that BOA reject Burnett's loan request. Greenwood initially agreed with Morris that it was "probably best" to reject the loan, but nevertheless then approved it. *Id.* at 931. Although Greenwood knew the fraudulent nature of the Burnett Straw Loan, the chief credit officer of BOA and its loan committee were never made aware of the loan's fraudulent aspects.

---

[14] Count Eleven charged a conspiracy under 18 U.S.C. § 1956(h) to launder proceeds from offenses alleged earlier in the Indictment, in contravention of 18 U.S.C. § 1957(a). In proving the money laundering conspiracy, the prosecution focused on proceeds from the Count Six misapplication of bank funds offense involving the Burnett Straw Loan, as well as the Count Eight wire fraud offense relating to the Queens Gap Scheme.

The BOA credit memorandum for the loan failed to indicate that Vinson was the party responsible for repaying it, did not reveal that Burnett had received a $40,000 kickback, and falsely asserted that the loan would be used for short-term working capital for Seven Falls, which would cover day-to-day expenses. The loan's intended use was actually to cover past-due loan payments for Seven Falls. Additionally, the HUD-1 settlement statement for the Burnett Straw Loan failed to disclose the actual loan terms and the kickback to Burnett.

### b. The Worlund Straw Loan

In July 2008, Hager recruited Worlund, a Cashion business associate, to obtain a $650,000 loan from PCB for the benefit of Vinson (the "Worlund Straw Loan").[15] The Worlund Straw Loan provided support for the Count Nine conspiracy[16] and the Count Ten misapplication of bank funds offense. The loan was to provide Vinson funding for an escrow account with a firm called AML & Associates, in an effort to secure AML's investment of $60 million in Seven Falls. A man named Dowling agreed that Vinson and his cohorts could use Dowling's annuity, valued at more than $900,000, as collateral for

---

[15] Although Zeus — rather than Worlund — was the intended borrower on the Worlund Straw Loan, PCB was unable to loan money to Zeus because its owners (Cashion, Chapman, and Gabler) already had loans with PCB that exceeded the bank's loans-to-one-borrower limit.

[16] Count Nine charged a conspiracy under 18 U.S.C. § 371 to defraud the United States by impairing the functions of the FDIC, as well as to commit offenses against the United States, including misapplication of bank funds and bank fraud, in contravention of 18 U.S.C. §§ 656 and 1344. The Count Nine conspiracy involved the Worlund Straw Loan and the Zeiger Straw Loan.

the Worlund Straw Loan. In exchange for using Dowling's annuity, Vinson agreed to pay Dowling a $35,000 kickback and have Cashion assign Dowling the right to receive $6,500 monthly for ten years. The loan documentation falsely reflected that the loan would be used for short-term financing for Seven Falls, and information concerning other material facts and the $35,000 kickback were not revealed to PCB's loan committee.

### c. The Zeiger Straw Loan

On February 25, 2009, Cashion's mother, Betty Zeiger, served as the straw borrower on a $50,000 loan from PCB (the "Zeiger Straw Loan"). The Zeiger Straw Loan provided underpinning for the conspiracy offense charged in Count Nine of the indictment. Cashion asked Gourlay if Zeiger could "borrow $50,000 to help [Vinson] with the payroll." *See* J.A. 1135. When the loan closed, Zeiger immediately endorsed the $50,000 loan proceeds check over to Vinson for his use at Seven Falls, and Vinson thanked Zeiger for her help. Gourlay confirmed at trial that the Zeiger Straw Loan was intended to help get Seven Falls past another short-term need. Indeed, the loan was always intended solely for Vinson and the Seven Falls payroll. PCB's loan committee had been falsely assured, however, that the purpose of the loan was to provide Zeiger with funds for a real estate investment. The loan committee was not informed that Vinson would be repaying the loan and that it actually benefitted him.

### 6. The Queens Gap Scheme

In early 2009, Vinson first met developer Devin McCarthy, who owned an under-construction 3,500-acre residential and golf course development in western North Carolina known as Queens Gap. McCarthy intended to sell Queens Gap and was willing

to be paid from the proceeds of future lot sales. In exchange, however, a buyer had to agree to complete the Queens Gap project. Vinson advised that he was willing to help McCarthy complete Queens Gap in exchange for an ownership interest therein (the "Queens Gap Scheme"). That scheme was the subject of five charges in the Indictment — the Count Two conspiracy, the wire fraud offenses charged in Counts Seven and Eight, the Count Eleven money laundering conspiracy, and the Count Thirteen money laundering offense.

Pursuant to the Queens Gap Scheme, McCarthy agreed to sell Queens Gap to Vinson and give him control over Queens Gap improvements, in exchange for a percentage on future lot sales. They also agreed that McCarthy would maintain control over all funds spent on the Queens Gap project and that such funds were to "be used for constructing infrastructure improvements to Phase I" at Queens Gap. *See* J.A. 6838. Their Queens Gap agreement required that all projects be approved by the parties' engineer before any funds could be used. It also specified that Vinson and McCarthy would be "joint signors on that account concurrently." *Id.*

On May 20, 2009, Vinson and McCarthy opened a joint Queens Gap account at BOA that required both their signatures for all disbursements. McCarthy deposited $4.25 million into the Queens Gap account, with the restriction that the funds could only be used for the Queens Gap infrastructure. According to McCarthy, BOA's Greenwood "and his staff understood how much money was coming into his bank and everybody was crystal clear on the protocol and how to handle it." *See* J.A. 1946. Greenwood knew that both signatures were required on each Queens Gap check, and that all checks and related

21

invoices had to be presented to McCarthy for signature. Vinson and McCarthy each signed the Queens Gap agreement and the Queens Gap account's dual signature card.

On July 2, 2009 — contrary to the Queens Gap agreement — Vinson executed a new signature card on the Queens Gap account at BOA that solely required Vinson's signature. Vinson also signed a resolution, approved by Greenwood, removing McCarthy as a signatory on the account. Two months later, in September 2009, McCarthy grew suspicious because he was unable to access the Queens Gap account and he had not received any invoices or checks. Furthermore, Greenwood had refused to discuss with McCarthy his lack of access to the Queens Gap account. When McCarthy tried to speak with Vinson about the millions of dollars he thought were in the account, Vinson answered with "gobbledygook." *See* J.A. 1962.

In November 2009, Vinson reassured McCarthy that his money was yet in the Queens Gap account, and Vinson actually wrote McCarthy a $2.5 million check that was drawn thereon. The check bounced, however, and McCarthy then discovered that — without his knowledge or approval — Vinson had withdrawn nearly all of the $4.25 million from the Queens Gap account, leaving a balance of only $79.

Four months earlier, on July 2, 2009, Vinson had transferred $2 million out of the Queens Gap account to a personal account he shared with his wife. From there, Vinson wired $1,368,000 to an account at Wachovia Bank and $144,600 to another Wachovia account, all for Seven Falls rather than Queens Gap. In fact, Vinson used the $4.25 million from the Queens Gap account to either pay Seven Falls' expenses or make deposits into Seven Falls-related accounts. Several Seven Falls and Queens Gap loans

22

then defaulted, resulting in heavy losses for lenders and various contractors and employees involved in those projects.

C.

On October 16, 2013, the prosecution rested its case against Vinson, a week and a half after the trial proceedings had begun. Vinson then sought judgments of acquittal from the trial court on each of the charges in the Indictment, pursuant to Rule 29 of the Federal Rules of Criminal Procedure.

Vinson essentially made three arguments in support of his Rule 29 motion. First, he contended that there was simply no evidence that he had ever lied to or deceived any banks, or that he had any role in any lies or deceptions directed towards them. Second, Vinson maintained that there was insufficient evidence to show that he was a "knowing member of any conspiracy with the goal of defrauding the United States or any federally insured institution." *See* J.A. 2100. Third, Vinson emphasized that he never believed he was doing anything wrong. The trial court, however, summarily denied Vinson's acquittal motion. Vinson then chose to rest the defense without testifying or presenting evidence.

During the district court's charge conference, Vinson focused on the prosecution's proposed willful blindness instruction, objecting to it being given and arguing that it was neither appropriate nor justified. The trial court, however, ruled against Vinson and agreed to give the jury the proposed willful blindness instruction. In pertinent part, that instruction advised the jury:

23

With regard to "knowledge," a defendant may not deliberately close his eyes to that which would otherwise be obvious. Such deliberate ignorance is also known as "willful blindness." If you find that [Vinson] was willfully blind as to the existence or purpose(s) of the conspiracy, then you may find that he had knowledge of the conspiracy.

*See* J.A. 2175.38.

Without objection, the trial court carefully explained to the jury the various elements of the offenses that were being tried. In sum, the court instructed that the following findings were necessary to convict Vinson.

- Count One: That an agreement was knowingly formed between two or more persons to commit bank fraud, by either knowingly and intentionally defrauding a bank or obtaining bank funds by false and fraudulent pretenses; and that, at some time during the existence of the conspiracy, Vinson had knowledge of the conspiracy's essential objectives and with that knowledge deliberately and voluntarily joined the conspiracy with the intent to further its unlawful purpose.

- Counts Two and Nine: That an agreement was knowingly formed between two or more persons to commit offenses against and to defraud the United States; that, at some time during the existence of the conspiracy, Vinson had knowledge of the conspiracy's essential objectives and with that knowledge deliberately joined the conspiracy with the intent to further its unlawful purpose; and that, also during the existence of the conspiracy, one of its members performed an overt act in order to further the conspiracy's unlawful purpose.

- Counts Three, Four, Five, Six, and Ten: That an officer or employee of a covered bank willfully misapplied the funds of the bank with the intent to defraud or inflict financial injury to the bank, and that Vinson knowingly and voluntarily participated in the criminal venture as something that he wished to bring about and committed an act intended to make the criminal venture succeed.

- Counts Seven and Eight: That Vinson knowingly devised a scheme to defraud with the intent to defraud; that, in furthering the scheme, Vinson caused the transmission of a writing, signal, picture, or sound

24

by means of a wire communication in interstate commerce; and that the scheme affected a covered bank.[17]

- Count Eleven: That an agreement was knowingly formed between two or more persons to commit money laundering, and that, at some time during the existence of the conspiracy, Vinson had knowledge of the conspiracy's essential objectives and with that knowledge deliberately and voluntarily joined the conspiracy with the intent to further its unlawful purpose.

- Counts Twelve and Thirteen: That Vinson knowingly engaged or attempted to engage in a monetary transaction in the United States involving property with a value greater than $10,000 that was derived from specified criminal activity, or that Vinson knowingly and intentionally aided and abetted the commission of that act.

On October 17, 2013, the jury returned verdicts of guilty on all thirteen counts of the Indictment. With respect to the substantive offenses charged in Counts Three through Eight and Ten through Thirteen, as well as the Count Eleven conspiracy offense, the jury returned general verdicts, choosing guilty as charged and rejecting the not guilty alternative. On the conspiracy offenses charged in Counts One, Two, and Nine, the jury was not only presented with the guilty or not guilty inquiry but was also asked to respond to a series of inquiries concerning the objects of the conspiracies.

As to Count One, the jury found that each of the objects of the bank fraud conspiracy involving the Lot Loan Scheme had been proven, that is, defrauding a bank under 18 U.S.C. § 1344(1) and obtaining bank funds by false and fraudulent pretenses under § 1344(2). The jury also found each of the objects of the Count Two conspiracy to

---

[17] Although Vinson was charged in Counts Seven and Eight with committing and aiding and abetting wire fraud offenses affecting a bank, the trial court did not instruct the jury on an aiding and abetting theory of those offenses.

be proven (involving the Plastics Plant Scheme, the Check Fraud Scheme, the Burnett Straw Loan, and the Queens Gap Scheme). And, on the Count Nine conspiracy, the jury again found each of the objects proven (involving the Worlund Straw Loan and the Zeiger Straw Loan).

In post-trial proceedings, Vinson renewed his motion for judgments of acquittal, reiterating his previously asserted positions on the thirteen charges in the Indictment and contending that the evidence was insufficient to show that he had committed any of the offenses alleged. The district court denied Vinson's renewed motion by Memorandum of Decision and Order of January 31, 2014. *See United States v. Vinson*, No. 1:12-cr-00020 (W.D.N.C. Jan. 31, 2014), ECF No. 311. After engaging in a detailed charge-by-charge assessment, the court concluded that there was "substantial evidence to support findings of guilt for each and every count in the Indictment." *Id.* at 18.

## D.

Vinson's sentencing hearing was conducted on June 25, 2015. On that occasion, the district court fixed Vinson's advisory Sentencing Guidelines range as 262 to 327 months of imprisonment, based on a total offense level of 39 and a criminal history category of I. Vinson argued for a sentence of thirty-six months, maintaining that there was no "significant distinction" between himself and Buck Cashion or Chapman, who had each been sentenced to thirty-six months. *See* J.A. 2245. In turn, the prosecution supported a within-Guidelines sentence, arguing that Vinson was "in a substantially different posture than his [coconspirators]." *Id.* at 2247.

26

The district court agreed with the prosecutors that Vinson was more culpable than any of his cohorts.[18] The court nevertheless granted Vinson a downward variance because, although his crimes were "extremely complex," the applicable Guidelines contemplated more extensive fraudulent conduct than that in which Vinson had engaged. *See* J.A. 2319-20. The court sentenced Vinson to nine concurrent sentences of 216 months on the offenses in Counts One, Three, Four, Five, Six, Seven, Eight, Ten, and Eleven; two concurrent sentences of sixty months on Counts Two and Nine; and two concurrent sentences of 120 months on Counts Twelve and Thirteen. The sentences were all ordered to run concurrently with each other, so that Vinson received an aggregate sentence of 216 months.[19]

Vinson timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

---

[18] On May 11, 2012, Greenwood was sentenced to forty-eight months in prison. After Vinson's trial, Greenwood's sentence was reduced to forty-two months. On November 26, 2013, Gourlay, who had testified against Vinson, was sentenced to fifteen months. That same day, Smith was sentenced to nine months. On August 14, 2014, Hager, who had also testified against Vinson, was sentenced to eight months. On June 2, 2015, Cashion, who had also testified, was sentenced to thirty-six months. That same day, Chapman was sentenced to thirty-six months, Durham to thirty months, and Ollis and Gabler to two years of probation.

[19] In addition to imposing the prison sentence, the district court ordered Vinson to make more than $18 million in restitution to several banks that were victims of his fraudulent activities and to the FDIC as Receiver for the two failed banks. Specifically, the court awarded restitution to the FDIC of more than $1 million for losses related to PCB and more than $5.5 million for losses related to BOA.

27

## II.

On appeal, Vinson pursues three contentions of error: that the evidence was insufficient to support his convictions of the charged offenses; that the trial court erred in giving the willful blindness instruction to the jury; and that his 216-month sentence is substantively unreasonable. We assess those contentions in turn.

## A.

Vinson first contends that the prosecution presented insufficient evidence to support a guilty verdict on any charge in the Indictment. We review de novo such an evidence insufficiency challenge, viewing the evidence and all reasonable inferences to be drawn therefrom in favor of the prosecution. *See United States v. Barefoot*, 754 F.3d 226, 233 (4th Cir. 2014). We are obliged to sustain a guilty verdict if any rational factfinder could have found the offense to be proven beyond a reasonable doubt. *Id.* Challenging the sufficiency of trial evidence presents a heavy burden for an appellant, as "[r]eversal for insufficient evidence is reserved for the rare case where the prosecution's failure is clear." *See United States v. Ashley*, 606 F.3d 135, 138 (4th Cir. 2010).

## 1.

Count One charged Vinson with a bank fraud conspiracy in connection with the Lot Loan Scheme, in contravention of 18 U.S.C. § 1349. As the trial court instructed the jury, such a conspiracy offense has two elements: (1) that two or more persons agreed to commit bank fraud; and (2) that at some time during the conspiracy, the defendant had knowledge of the criminal objective of the agreement and willfully joined the conspiracy with the intent to further its unlawful purpose. *See United States v. Chittenden*, 848 F.3d

28

188, ___ (4th Cir. 2017). The jury found Vinson guilty and identified two objects of the conspiracy under 18 U.S.C. § 1344, i.e., defrauding a bank and obtaining bank funds by false and fraudulent pretenses.

On appeal, Vinson argues that a judgment of acquittal should have been awarded on Count One for failure to prove even the first element of a bank fraud conspiracy, i.e., for lack of "proof of an agreement to intentionally misrepresent or purposely conceal." *See* Br. of Appellant 27. In support of that argument, Vinson asserts that "all the efforts to sell lots and secure financing for Seven Falls were patently obvious, well-documented by the pertinent banking records and known by all the bank officers who made independent business decisions to approve loans." *Id.* According to Vinson, the loans made as part of the Lot Loan Scheme "turned out to be extremely poor business decisions," but those decisions were made only after "all the essential terms of the sales were fully disclosed." *Id.* at 27, 30. Vinson specifically points to BOA and PCB as lenders whose officers — namely Greenwood, Gourlay, and Durham — possessed full knowledge of the terms of the Lot Loan Scheme's sales contracts.

Notwithstanding Vinson's protestations that the terms of the lot sales were always transparent, the evidence plainly showed otherwise. Vinson and his cohorts failed to disclose to the lenders material terms of lot loan transactions, including the following: that the loans were being obtained by straw borrowers for Vinson's benefit; that, pursuant to side agreements between Vinson and the straw borrowers, Vinson promised to repurchase the lots, to make the straw borrowers' loan payments for two years, to pay them monthly kickbacks, and to give them "seller concessions" covering their down

29

payments; that the borrowers were simultaneously obtaining loans on additional lots from other banks; and that fraudulently inflated appraisals were being used. The evidence established that, if those terms had been disclosed, the banks' respective loan committees (including the committees at BOA and PCB) would not have approved the loans. That Greenwood, Gourlay, and Durham were aware of all the loan terms is not a valid defense for Vinson on the bank fraud conspiracy charge, in that such bank officers were part and parcel of the conspiracy to both defraud the banks and obtain bank funds by false and fraudulent pretenses.

Furthermore, there was ample evidence that Vinson knew the criminal objective of the bank fraud conspiracy and willfully joined that conspiracy with the intent to further its unlawful purpose. For example, Vinson gave Buck Cashion the go-ahead for the Lot Loan Scheme as a way to circumvent PCB's loans-to-one-borrower limit, entered the side agreements with the straw borrowers and paid them kickbacks, was kept apprised by Hager as the conspirators moved loan applications from bank to bank and substituted the names of borrowers to suit their purposes, conferred with Ollis about false appraisals, and personally attended many of the lot loan closings. Indeed, Vinson was not only consulted "on every single transaction," *see* J.A. 1203, but he was also the primary beneficiary of the conspiracy, amassing about $10 million for his use on the Seven Falls development. In these circumstances, the evidence was wholly sufficient to convict Vinson of the Count One conspiracy offense.

30

2.

Counts Two and Nine of the Indictment charged Vinson with separate conspiracies to commit offenses against and to defraud the United States, in violation of 18 U.S.C. § 371. In order to prove a § 371 conspiracy, the prosecution must show the following: (1) an unlawful agreement between two or more people to commit a crime; (2) that the defendant "knowingly and willingly participated in that conspiratorial endeavor"; and (3) an overt act committed in furtherance of the conspiracy. *See United States v. Singh*, 518 F.3d 236, 252 (4th Cir. 2008). Here, the trial court instructed the jury on those very elements, as well as the alleged objects of the conspiracies.

a.

The alleged objects of the Count Two conspiracy offense — involving the BOA-related Plastics Plant Scheme, Check Fraud Scheme, Burnett Straw Loan, and Queens Gap Scheme — included fraud impairing the functions of the FDIC, plus the offenses of making false entries in bank records under 18 U.S.C. § 1005, misapplication of bank funds under 18 U.S.C. § 656, wire fraud affecting a bank under 18 U.S.C. § 1343, and bank fraud under 18 U.S.C. § 1344. In deeming Vinson guilty on Count Two, the jury found against him on each alleged object of the conspiracy offense, but needed to find only one. Because we conclude that the evidence was sufficient to sustain Vinson's conviction as to several objects, we do not review the evidence as to all of them.

With respect to the Plastics Plant Scheme, Vinson contends that the evidence "only showed an arm's length transaction freely entered into by all participants" for the express purpose, as stated in the pertinent BOA credit memorandum, of "short-term-

31

investment in Seven Falls." *See* Br. of Appellant 32-33 (internal quotation marks omitted). Viewed in the proper light, however, the evidence established that Vinson utilized straw borrowers to obtain the plastics plant loan from BOA and circumvent its loans-to-one-borrower limit. Vinson pledged the plastics plant property as collateral for the loan and then used the proceeds to pay off outstanding Seven Falls-related loans, rather than for the stated purpose of providing short-term capital for Seven Falls. The fraudulent nature of the Plastics Plant Scheme was known by BOA's Greenwood, who participated therein, but was concealed from the BOA loan committee. The evidence thus supports the proposition that Vinson conspired with Greenwood and others to commit the offenses of misapplication of bank funds and bank fraud, as defined for the jury by the trial court in its instructions.

Similarly — and contrary to Vinson's protestations of another "entirely normal and utterly transparent" loan transaction, *see* Br. of Appellant 35 — the evidence showed that material terms of the Burnett Straw Loan were known by Greenwood but concealed from the BOA loan committee. Those terms included that Burnett was a straw borrower seeking the loan for Vinson's benefit; that Vinson paid Burnett a $40,000 kickback and promised him $10,000 a month for up to four months if the loan was not repaid within sixty days; that the Seven Falls lot being used as collateral for the loan was falsely appraised to make it appear that Burnett was borrowing no more than 75% of the lot's value; and that the loan proceeds were to be used to cover past-due loan payments for Seven Falls, rather than for the stated purpose of short-term working capital to cover Seven Falls' day-to-day expenses. Accordingly, the evidence was sufficient to prove that

32

Vinson again conspired with Greenwood and others to commit the offenses of misapplication of bank funds and bank fraud, as charged in Count Two.

b.

The alleged objects of the Count Nine conspiracy offense — involving the Worlund and Zeiger Straw Loans made by PCB — were fraud impairing the functions of the FDIC, misapplication of bank funds, and bank fraud. The jury not only found Vinson guilty on Count Nine, but found against him as to each alleged object of the conspiracy offense. On appeal, Vinson insists that there was nothing fraudulent about the Worlund and Zeiger Straw Loans. Critically, Vinson ignores evidence that PCB's Gourlay was aware of material terms of the Worlund Straw Loan that were not revealed to the PCB loan committee, including that Hager recruited Worlund to obtain the loan to circumvent PCB's loans-to-one-borrower limit, that Vinson agreed to pay for use of another man's annuity as collateral for the loan, and that the loan documentation falsely reflected the loan would be used for short-term financing for Seven Falls. Vinson also disregards evidence that the PCB loan committee was not informed that the Zeiger Straw Loan was to be used to cover the Seven Falls payroll and was to be repaid by Vinson. That evidence showed, in support of Count Nine, that Vinson conspired with Gourlay and others to commit the offense of misapplication of bank funds and bank fraud.

3.

Counts Three through Six, as well as Count Ten, charged Vinson with aiding and abetting the misapplication of bank funds, in contravention of 18 U.S.C. §§ 656 and 2. As the trial court instructed the jury, a § 656 offense occurs when an officer or employee

33

of a covered bank willfully misapplies the funds of the bank and does so "with the intent to injure or defraud the bank." *See United States v. Duncan*, 598 F.2d 839, 858 (4th Cir. 1979). Vinson was prosecuted under § 2, the aiding and abetting statute, which provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal." The government therefore had to prove that Vinson had aided and abetted the commission of the offense of the misapplication of bank funds by committing an act in furtherance of that offense with the intent to facilitate its commission. *See Rosemond v. United States*, 134 S. Ct. 1240, 1243 (2014).

a.

Four separate counts had BOA's Greenwood as a principal and Vinson as an aider and abettor — specifically, Count Three (involving the Plastics Plant Scheme), Counts Four and Five (relating to the Check Fraud Scheme), and Count Six (concerning the Burnett Straw Loan). Echoing arguments made with respect to the Count Two conspiracy offense, Vinson insists that the transactions underlying the Plastics Plant Scheme and the Burnett Straw Loan were conducted at arms-length and with full disclosures. Thus, Vinson contends, there simply was no misapplication of bank funds. Additionally, on the premise that he had only "casual contacts" with Greenwood, Vinson suggests that he cannot have been Greenwood's aider and abettor or acted with the requisite criminal intent. *See* Br. of Appellant 39.

The evidence was sufficient to establish, however, that Greenwood misapplied bank funds when he pushed through the Plastics Plant Scheme-related loan and the

34

Burnett Straw Loan without disclosing material terms of those loans to the BOA loan committee, including that the loans were for Vinson's benefit but were being made to straw borrowers in order to circumvent the bank's loans-to-one-borrower limit, and that Vinson was responsible for repaying the loans. *See United States v. Luke*, 701 F.2d 1104, 1107 (4th Cir. 1983) (concluding that the misapplication of bank funds occurs where "loans [are] made to named individuals who, with the knowledge of bank officials, pass[] on the proceeds to third parties," and where the bank officials do "not intend to look to [the named borrower] for repayment"). The evidence was also sufficient to prove that Vinson committed acts in furtherance of the Count Three and Six offenses with the intent to facilitate Greenwood's commission of those offenses by, inter alia, providing the plastics plant property and a Seven Falls lot as collateral for the straw loans. Notably, that very evidence proved the misapplications of bank funds involving the Plastics Plant Scheme and the Burnett Straw Loan as objects of the Count Two conspiracy. *See United States v. Burgos*, 94 F.3d 849, 873 (4th Cir. 1996) ("The same evidence establishing a defendant's participation in a conspiracy may support a conclusion that a defendant participated in the principal's unlawful intent to [commit an offense], thereby proving guilt of aiding and abetting as well.").

Turning to the Check Fraud Scheme, Counts Four and Five charged Vinson with aiding and abetting the misapplication of bank funds in relation to Greenwood's initial approval of the $400,000 bad check that Vinson wrote to Zeus in August 2008, followed by Greenwood's approval of a $308,000 loan in December 2008 to cover the resulting deficit in Vinson's Sevens Falls account. Vinson maintains that the BOA loan

35

committee's retroactive authorization of the $308,000 loan in January 2009 — more than four months after the $400,000 bad check was approved — demonstrates that no misapplication of bank funds occurred.

Under the evidence, the jury was entitled to find that Greenwood misapplied bank funds when he approved the $400,000 bad check, because his authority was limited to approving insufficient funds checks of $50,000 or less. The jury was also entitled to find that Greenwood again misapplied bank funds by approving the $308,000 loan to cover the deficit in the Seven Falls account, in that Greenwood was not authorized to unilaterally approve a loan of that amount. Furthermore, the evidence was sufficient to prove that Vinson committed acts in furtherance of the Count Four and Five offenses by writing the $400,000 check on an account with grossly insufficient funds and by signing the loan agreement to rectify the resulting deficiency. The jury was also entitled to infer Vinson's criminal intent from the trial evidence, which demonstrated that he and Greenwood regularly colluded — directly and through intermediaries — to fraudulently obtain and misuse BOA funds to cover Vinson's ever-burgeoning debts.

The BOA loan committee's retroactive authorization of the $308,000 loan simply does not obviate the misapplication of funds offenses that had already occurred. *See Duncan*, 598 F.2d at 858 ("[I]t is sufficient that the defendant . . . temporarily deprive[d] the bank of the possession, control or use of its funds."). In any event, the evidence reflected that the BOA loan committee did not intend to ratify Greenwood's unauthorized decision to improperly transfer funds to Vinson. Rather, the loan committee — expecting there would never be a repayment from Vinson —approved the loan to avoid the entry of

36

an end-of-year record of a $308,000 loss or unauthorized loan.  In these circumstances, the jury was entitled to conclude that Vinson aided and abetted Greenwood in misapplying BOA funds, as alleged in Counts Four and Five.

b.

Count Ten, involving the Worlund Straw Loan, had PCB's Gourlay as a principal and Vinson as an aider and abettor.  Invoking his arguments at to the Count Nine conspiracy offense, Vinson maintains that "[t]here being no fraud, there can also be no misapplication of bank funds." *See* Br. of Appellant 52.  According to Vinson, although "in hindsight, this loan may well have been a foolish business decision by the bank, the bank at all times had the ability, to quote Nancy Reagan, to 'just say no.'" *Id.*  To the contrary, the evidence was sufficient to prove that Gourlay misapplied bank funds by concealing material loan terms from the PCB loan committee to gain its approval of the Worlund Straw Loan.  Gourlay withheld from the loan committee, inter alia, that the loan was being made to a straw borrower for Vinson's benefit to circumvent the bank's loans-to-one-borrower limit, and that Vinson was responsible for repaying the loan.  Meanwhile, Vinson was shown to have committed acts in furtherance of the Count Ten offense with the intent to facilitate Gourlay's commission of that offense by, e.g., agreeing to pay a third party for use of his annuity as collateral for the loan.  That is, the evidence was sufficient to establish that Vinson aided and abetted the misapplication of bank funds.

4.

Relevant to the Queens Gap Scheme, Counts Seven and Eight of the Indictment charged Vinson with, in relevant part, committing two wire fraud offenses affecting a bank, in violation of 18 U.S.C. § 1343. Generally, as included in the trial court's jury instructions, the essential elements of wire fraud "are (1) the existence of a scheme to defraud and (2) the use of a wire communication in furtherance of the scheme." *See United States v. Jefferson*, 674 F.3d 332, 366 (4th Cir. 2012) (alteration and internal quotation marks omitted). To prove a scheme to defraud, the prosecution must establish that the defendant acted with the specific intent to defraud. *See United States v. Wynn*, 684 F.3d 473, 478 (4th Cir. 2012).

Count Seven involved the wire transfer of $1,368,000 on July 2, 2009, from Vinson's personal account at BOA to a Wachovia Bank account for the benefit of Seven Falls, using funds from the joint Queens Gap account at BOA. Count Eight concerned the wire transfer of $144,600, on that same date, of funds from Vinson's personal BOA account to another Wachovia account, again for the benefit of Seven Falls. Those funds also originated from the Queens Gap account. Vinson contends that he cannot be guilty of wire fraud for either transaction because the funds involved belonged to him when they were transferred. *See* Br. of Appellant 40 ("[B]oth disputed transfers were of funds legally belonging to [Vinson], and thus cannot form the basis for a criminal wire fraud."). Vinson acknowledges that he changed the Queens Gap account to require only one signature, but claims that he did so with the approval of BOA "in the normal course of business." *Id.* at 42. Vinson further maintains that the Queens Gap account was not

38

really a joint account, but was the property of Queen's Gap Acquisitions, LLC, which Vinson owned. As a result, according to Vinson, the two wire transfers with respect to Counts Seven and Eight were "routine" and not criminal acts. *Id.* Additionally, Vinson argues that any disagreement over who owned the funds is a civil dispute that is simply a garden variety breach of contract claim relating to the Queens Gap development.

The evidence was sufficient to establish, however, that Vinson was not the sole owner of the Queens Gap account and could access the funds in the account only if he met certain conditions. That is, the funds could not be withdrawn without the signatures of both Vinson and McCarthy, and only then to pay for infrastructure construction at Queens Gap approved by the parties' engineer. Under the evidence, Vinson unilaterally and fraudulently replaced the Queens Gap account's dual signature card with one that required only his signature and signed a resolution, approved by BOA's Greenwood, removing McCarthy as a signatory on the account. Within six months of the Queens Gap account being opened, Vinson had drained nearly all the $4.25 million that McCarthy had deposited into the account. Viewing that evidence in the light most favorable to the prosecution, the jury was entitled to find that Vinson participated in and carried out a scheme to defraud by the unauthorized use of Queens Gap funds for his own benefit and for Seven Falls-related obligations. The jury could also readily find that the July 2, 2009 wire transfers of large sums of money to the Wachovia accounts were made in furtherance of that scheme, as charged in Counts Seven and Eight.

5.

Finally, Count Eleven charged Vinson with a conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), while Counts Twelve and Thirteen charged him with committing and aiding and abetting money laundering, in contravention of 18 U.S.C. §§ 1957 and 2. The trial court instructed that, in order to obtain a conviction for money laundering under § 1957, the prosecution must prove that the defendant knowingly engaged or attempted to engage in a monetary transaction in the United States involving property with a value greater than $10,000 that was derived from specified criminal activity. *See United States v. Cherry*, 330 F.3d 658, 668 (4th Cir. 2003). The court further instructed that, to prove a money laundering conspiracy under § 1956(h), the prosecution must establish that an agreement was knowingly formed between two or more persons to commit money laundering, and that, at some time during the existence of the conspiracy, the defendant had knowledge of the conspiracy's essential objectives and with that knowledge deliberately and voluntarily joined the conspiracy with the intent to further its unlawful purpose. *See Singh*, 518 F.3d at 248.

For the Count Twelve money laundering offense, the specified criminal activity was the Count Six misapplication of bank funds offense involving the Burnett Straw Loan, and the monetary transaction was Vinson's payment of the $40,000 kickback to Burnett. For Count Thirteen, the specified criminal activity was the Count Eight wire fraud offense relating to the Queens Gap Scheme, and the monetary transaction was Vinson's transfer of $144,600 to one of the Wachovia accounts. The prosecution's theory of the Count Eleven money laundering conspiracy offense, in turn, was that

40

Vinson conspired with others to commit the Count Twelve and Thirteen offenses. In contesting those convictions on appeal, Vinson simply repeats his attacks on the prosecution's proof as to Counts Six and Eight, arguing that because there was no criminal activity with respect to the Burnett Straw Loan and the Queens Gap Scheme, there could be no money laundering or conspiracy to commit money laundering. Because we have determined that Vinson's convictions on Counts Six and Eight were supported by substantial evidence, however, we are provided with no valid basis for deeming the evidence insufficient on Counts Eleven through Thirteen. In sum, then, we conclude that the prosecution presented adequate proof of each of the thirteen charges lodged against Vinson in the Indictment.

## B.

Next, Vinson maintains that the trial court erred by instructing the jury on willful blindness. We review a court's decision to offer a willful blindness instruction for abuse of discretion. *See United States v. Jinwright*, 683 F.3d 471, 478 (4th Cir. 2012). Under the willful blindness doctrine, the government may "prove knowledge by establishing that the defendant deliberately shielded himself from clear evidence of critical facts that are strongly suggested by the circumstances." *Id.* at 478-79 (alterations and internal quotation marks omitted). As we have explained, "[a] willful blindness instruction is appropriate when the defendant asserts a lack of guilty knowledge but the evidence supports an inference of deliberate ignorance." *See United States v. Abbas*, 74 F.3d 506, 513 (4th Cir. 1996). Furthermore, where the trial evidence "supports both actual

knowledge on the part of the defendant and deliberate ignorance, a willful blindness instruction is proper." *Id.*

Each of the charges lodged against Vinson in the Indictment required a finding that he acted knowingly. Throughout these proceedings, Vinson has insisted that there was a dearth of evidence that he either knew of or "deliberately turned a blind eye to any illegal banking activity." *See* Br. of Appellant 59. We disagree. First of all, there was ample evidence that Vinson knowingly and intentionally engaged in fraudulent activities — including evidence that Vinson himself paid kickbacks to straw borrowers, signed contracts and closing documents that misrepresented the purpose and material terms of loan transactions, and engaged in a pattern of writing checks for thousands (and even hundreds of thousands) more dollars than were in the relevant bank accounts. Indeed, email and other communications with his cohorts corroborated Vinson's guilty knowledge.

Moreover, the government presented evidence of deliberate ignorance. For example, there was evidence that Vinson requested the assistance of others to obtain bank funding Vinson needed but knew he could not obtain on his own, and that Vinson's coconspirators then kept him abreast of details of their various schemes, even though Vinson did not always respond to their communications. As the government asserts, that evidence suggests, "at a minimum," that Vinson "deliberately failed to ask questions that might have incriminated him." *See* Br. of Appellee 69. Thus, the trial court acted well within its discretion in charging the jury on willful blindness.

C.

Finally, Vinson contends that his below-Guidelines sentence of 216 months in prison is substantively unreasonable. We review the substantive reasonableness of a sentencing decision for abuse of discretion. *See United States v. Howard*, 773 F.3d 519, 527-28 (4th Cir. 2014). In so doing, we are obliged to "apply a presumption of reasonableness to a sentence within or below a properly calculated guidelines range." *See United States v. Weon*, 722 F.3d 583, 590 (4th Cir. 2013). That "presumption can only be rebutted by showing that the sentence is unreasonable when measured against the 18 U.S.C. § 3553(a) factors." *See United States v. Louthian*, 756 F.3d 295, 306 (4th Cir. 2014).

Characterizing his sentence as "draconian," Vinson asserts that the 216-month term "results in the sort of unfair disparity between co-defendants that 18 U.S.C. § 3553(a)(6) rightly condemns and unfairly elevates [his] role in Seven Falls beyond others whose responsibility is arguably far greater and certainly no less." *See* Br. of Appellant 60-61. At bottom, Vinson relies on his cohorts' lower sentences to argue the unreasonableness of his own sentence. But, as we have recognized, "comparing the sentences of defendants who helped the Government to those of defendants who did not . . . is comparing apples and oranges." *See United States v. Perez-Pena*, 453 F.3d 236, 243 (4th Cir. 2006). Each one of Vinson's comparators admitted to criminal responsibility and many of them cooperated with the prosecutors. On the other hand, Vinson failed to accept responsibility for his crimes, made a lengthy allocution to the court at the sentencing hearing where he continued to deny his guilt, and has never

expressed remorse for his criminal activities. Moreover, the sentencing court concluded that Vinson's sentence should reflect that he was the "hub of the wheel" who "had a greater connection to more of the . . . criminal activity" than any of his coconspirators. *See* J.A. 2317. In these circumstances, the presumption of reasonableness applies, and Vinson's sentence must stand.

## III.

Pursuant to the foregoing, we are satisfied to reject Vinson's contentions of error and affirm his convictions and sentence.

*AFFIRMED*